No. 20,169.

TRANSIT EQUIPMENT COMPANY *v.*
BENEDICTO DYONISIO, ET AL.
(391 P. [2d] 478)

Decided April 6, 1964.    Rehearing denied May 4, 1964.

Messrs. TIPPIT and HASKELL, Mr. JOHN R. EVANS, for plaintiff in error.

Mr. FRANK P. LYNCH, JR., Mr. KENNETH C. GROVES, for defendants in error Benedicto Dyonisio, World Aircraft and Sales Company and Sanford Export Company.

Mr. CHARLES D. BROMLEY, for defendants in error

Alonzo Petteys and Companhia Motores Centro Americanos, S.A.

Messrs. LEWIS, GRANT and DAVIS, Mr. WILLIAM P. WAGGENER, for defendant in error Denver United States National Bank.

*En Banc.*

MR. JUSTICE HALL delivered the opinion of the Court.

THE parties appear here in the same order as in the trial court. Plaintiff in error is a corporation substantially owned and controlled by one Marshall. We refer to it as Transit and to Marshall by name.

The defendant in error Benedicto Dyonisio substantially owns and controls the defendants in error, World Aircraft and Sales Company and Sanford Export Company. We treat them as one and refer to them as Dyonisio.

The defendant in error Companhia Motores Centro Americanos, S. A., is substantially owned and controlled by the defendant in error Alonzo Petteys. We treat them as one and refer to them as Petteys.

The defendant in error The Denver National Bank is a mere stakeholder. We refer to it as the Bank.

In an original proceeding, *Dyonisio v. Robert H. McWilliams, et al.,* 139 Colo. 308, 338 P. (2d) 684 (1959), this court had before it, in addition to McWilliams, all of the parties to this action. Therein we had before us much of the record here presented. In the opinion resolving that case is a rather extensive resume of the pleadings of the parties there before the court, and in said opinion is a detailed statement of the pleadings in this action which should be considered in connection with this opinion.

Events which led up to this litigation are somewhat complicated and extend over a period of nearly four

years. The record is voluminous, detailed, and testimony over a wide range of subjects is bolstered with a great many exhibits.

Very briefly and chronologically it may be stated that in September 1954 Dyonisio learned that the Denver Tramway Company had for sale a fleet of trolley buses that it had discontinued using. At that time Dyonisio, who had contacts in South America, endeavored without success to sell the buses in Brazil.

In May or June 1955 Petteys purchased from the Denver Tramway Company these trolley buses and certain tires for the total purchase price of approximately $250,000.00.

In October of 1955 Petteys and Dyonisio entered into negotiations looking to the sale by Petteys to Dyonisio of seventy-five of the buses, the same to be refurbished by Petteys. At that time Dyonisio thought that he could sell the buses to a municipal transportation company located in Sao Paulo, Brazil. We refer to this company as CMTC. Petteys was aware of the fact that his sale to Dyonisio was contingent on Dyonisio's ability to consummate a deal with CMTC. In November of 1955 agents of CMTC came to Denver and inspected the buses.

On December 1, 1955, Dyonisio for the first time contacted Marshall by telephone. His purpose was to enlist his aid in making a sale of the buses. Marshall, operating as Transit, had had many years of business experience selling equipment in Brazil and it was because of his experience, knowledge and contacts in Brazil that Dyonisio sought his aid. It was no doubt contemplated by Marshall and Dyonisio that on consummation of the deal there would be some division of profits or other remuneration to Marshall. Petteys was not a party to these negotiations between Marshall and Dyonisio, but was later informed of them, and he and Dyonisio made an investigation of the financial standing of Marshall and learned that he was a man of means and qualified

to advance substantial sums of money and had extensive credit. From the record it appears that Transit, a corporation with limited liability, had assets of small and questionable value. Petteys and Dyonisio both contend that they never had any dealings with Transit but only with Marshall.

Dyonisio, Marshall and Petteys, on a purely volunteer basis, all sought to aid in making a sale of the buses to CMTC.

Several trips to Brazil were made by Petteys, as a volunteer, and Dyonisio, seeking to consummate the sale and to obtain from the Bank of Brazil an import license. Without the license the sale could not be consummated. Dyonisio made numerous other trips to Brazil by himself, he spent much time, effort and money — he claimed $100,000.00 — in seeking to consummate the deal. Marshall at times lent his influence, called some of his Brazilian friends, entertained some, and did in a limited way endeavor to assist in getting the deal closed; he put out no money other than the cost of telephone calls, cost of telegrams, possibly the cost of a few meals, and the cost of entertaining a few persons in his home.

In March of 1956 Petteys and Dyonisio went to Brazil and submitted a joint bid for the sale of seventy-five buses (without tires) to CMTC for $858,750.00 plus an estimated additional sum of $11,250.00 for tires. Sale of the tires was contingent upon Brazil's consent to the import of one of its main exports, rubber. In connection with making this bid a good faith deposit of $4200.00 was required. Petteys put up this deposit.

In June of 1956 Dyonisio and Petteys met Marshall in New York and on that occasion all met in the office of Marshall's attorneys. At that time Petteys had agreed to sell the buses to Dyonisio; he at that time believed that Marshall, not Transit, was going to contribute funds to pay for the buses and acquire some rights in the sale to CMTC. It is not clear from the record as to what the

rights and duties, if any, of Dyonisio and Marshall each to the other were at that time.

Marshall testified that:

"We [Transit, Petteys and Dyonisio] agreed that we should at that point have a complete understanding, a contractual understanding as to what should be done between the three of us, and we went to Mr. Alyea [Marshall and Transit's attorney] on June 21 and discussed how they thought that the contracts should be drawn to cover our situation for the three of us."

Nothing came of the discussions and no contracts were prepared, submitted or signed, nor was anything done to clarify the then rights or duties, if any, of the three persons, one to the other, nor was anything done to create any new rights or impose new duties on the parties.

In July 1956 CMTC signed an order for the buses pursuant to the joint bid of Petteys and Dyonisio made in March; however, the order was conditioned on the seller complying with seven requirements, including obtaining from the Bank of Brazil an "import license," a prerequisite to consummating the sale.

Dyonisio remained in Brazil endeavoring to comply with prerequisite conditions to completion of the deal. He returned to the States in October 1956, having failed to meet the conditions imposed by CMTC.

In October 1956, Petteys, Marshall and Dyonisio again met in New York and spent most of three days in the offices of Marshall's attorneys. During that time these attorneys were seeking to put on paper in one agreement the respective rights and duties, each to the other, of Transit (not Marshall), Petteys and Dyonisio. At least three drafts of a contract between Transit, Dyonisio and Petteys were drawn by Marshall's attorneys during the period October 23, 24 and 25 — none was signed, none proved acceptable. A fourth draft, referred to as the November draft, was prepared on October 30, 1956, after Petteys and Dyonisio had left New York. This draft

represented the attorneys' ideas of what should be agreed upon, and even included many new ideas and a new party, The Irving Trust. It was never signed and certainly went far beyond reducing to writing that which the parties had previously agreed upon, if anything.

Prior to leaving New York on October 25, 1956, Petteys had told Dyonisio that the sale of the buses would be off unless consummated by November 15, 1956. This was confirmed by letter dated October 23, directed to Dyonisio in California. Petteys testified that this letter was really written October 26, 1956, and dated back to October 23.

On October 25, 1956, Petteys returned to Colorado. Dyonisio, two or three days later, went to California and almost immediately returned to New York to meet with Marshall and a Dr. Cataval, a representative of the Bank of Brazil, who was sent by the Bank to examine the buses, with the idea of getting information which might aid in determining whether the import license should be issued. Dr. Cataval came to Denver and, on November 4 and 5, examined the buses; Petteys and Dyonisio were present.

Dr. Cataval, on November 5, left Denver for New York, and there met with Marshall and reported to him as to the good condition of the buses.

After the departure of Dr. Cataval, Petteys and Dyonisio went to Los Angeles. There Dyonisio contacted his lawyers, seeking to have prepared an agreement which would prove acceptable to Petteys, Transit and Dyonisio. The first draft proved unacceptable to Petteys. Following this unsuccessful effort Petteys and Dyonisio again met with the lawyers. At that time the lawyers prepared, at Dyonisio's request, two very complete and detailed agreements. Essentially they were:

(1) An agreement between Petteys as seller and Dyonisio and Transit as buyers, whereby Petteys agreed to sell and the buyers agreed to purchase the seventy-

five buses for $397,500.00. Sale of the buses was to be in their then condition without any refurbishing, the cost of which would be about $125,000.00. Refurbishing was a prerequisite of the purchase order from CMTC.

(2) An agreement between Dyonisio and Transit which provided that they should purchase the buses, refurbish them, and consummate the sale to CMTC, Dyonisio to receive $100,000.00 for moneys already expended or obligated. Transit was to advance moneys for refurbishing ($125,000.00), loading charges, freight insurance, and other costs of getting the buses to port of embarkation ($52,500.00) and other items calling for the expenditure of minor amounts; the net profits of the deal, after deducting the purchase price and all expenses, including $100,000.00 to be paid to Dyonisio as reimbursement for his expenses to be divided equally between Dyonisio and Transit.

These agreements were, on November 13, 1956, mailed by Dyonisio's attorneys to Transit, with directions that they be signed and returned prior to November 26, 1956. The letter transmitting these argreements stated that failure of Marshall to sign and return by November 26, 1956:

"* * * will be construed as an unwillingness to consummate the transaction and to perform your obligations thereunder and the other parties will consider themselves at liberty to negotiate other arrangements."

The agreements did not meet with the approval of Transit. Dyonisio urged Marshall to come to California to see if they could not settle their differences and extended the time for termination until November 29. Marshall declined to go to California and urged Petteys and Dyonisio to go to New York to endeavor to revamp the so-called November draft to make it acceptable to all. Petteys and Dyonisio refused to go to New York. Petteys and Dyonisio urged Marshall to meet with them in Denver in an effort to come to an agreement. Marshall declined.

On December 15, 1956, Petteys served notice on Dyonisio and Transit that he elected to terminate and cancel all negotiations had with reference to the sale of the buses and withdrew all offers of such sale.

On January 10, 1957, Petteys and Dyonisio entered into a contract in substantially the same form as that prepared by Dyonisio's lawyers between Transit and Dyonisio and which Transit refused to sign. Petteys was substituted for Transit and it was agreed that the purchase price of the buses should be $397,500.00 to be paid to Petteys, that Petteys would advance money to refurbish the buses, for freight, etc.; that Dyonisio, from the proceeds of the sale, was to get $100,000.00 for expenses; and the profits, after paying the cost of the buses, refurbishing, etc., should be divided equally between Dyonisio and Petteys.

On February 21, 1957, the Bank of Brazil issued its import license, thus removing the last obstacle to completing the sale of the buses to CMTC. The buses were delivered during the early part of 1957, and the first payment from CMTC, in the amount of $96,000.00, received March 5, 1957. Other payments have been made pursuant to the original contract between Dyonisio and CMTC. Payments received under the contract of sale have been disbursed by the Bank as escrow agent and pursuant to the January 10, 1957, contract entered into between Petteys and Dyonisio.

Transit has received nothing and, except for $1830.00 loaned to Dyonisio, has put out nothing in the way of money. On November 21, 1956, Dyonisio offered to pay to Transit this sum of $1830.00, together with any incidental expenses that it might have incurred or outlays made, except legal fees, in seeking to consummate the sale of the buses.

Transit commenced this action April 21, 1958. It sets forth in substance most of the foregoing facts and asks:

(a) That all payments made or to be made by CMTC

be subjected to a constructive trust in favor of Transit to the extent of its interest;

(b) That the court declare that Transit is the owner, to the extent proven, of the contract of sale and funds derived or to be derived therefrom;

(c) That Transit have an equitable lien on all funds paid under the sales contract;

(d) That Transit have interest on the sums due it;

(e) That it recover its costs.

Petteys and Dyonisio filed separate answers, wherein they admit many facts pleaded by Transit, and deny others, and deny that Transit is entitled to any relief.

The Bank answered, wherein it admits that it is acting as escrow agent pursuant to written instructions dated January 25, 1957, signed by Petteys and Dyonisio, and that it has received moneys and paid out moneys pursuant to said instructions, and denies other allegations of the complaint. The Bank takes the position that it is only a stakeholder and expresses its willingness to comply with any lawful order of the court with reference to funds presently held by it pursuant to the terms of said escrow.

Trial was to the court which, on October 27, 1961, made extensive findings of fact and entered judgment against the plaintiff (Transit) and in favor of the defendants, with costs to the defendants.

Transit is here by writ of error seeking reversal, contending that:

I. The Court erred in holding as a matter of law that Plaintiff's case did not establish an equitable lien, unjust enrichment or a constructive trust.

II. "Equity will enforce a promise made to induce action when relied upon by the promisee."

III. The Court erred in finding as a matter of law that the evidence in this case did not establish a joint venture between *Marshall* and *Dyonisio*.

IV. The Court erred as a matter of law in finding that

there was no joint venture between *Petteys, Marshall* and *Dyonisio*.

V. "The Trial Court erred by overruling the motion of the plaintiff to strike all the testimony of Petteys and in denying plaintiff's motion to reopen the trial for the purpose of impeaching Dyonisio. In the alternative, the testimony of Petteys and Dyonisio contains so many contradictions, misstatements, admitted perjuries and constant and obvious evasion that no weight should be given to it."

In the trial court's opinion and judgment it is stated:

"The matters which give rise to this claim are generally not in dispute * * *."

Counsel for Transit apparently share this view of the trial court, for in their brief we find the following language:

"* * * the basic facts of the matter are not essentially in dispute * * *."

We, too, find little, if any, dispute in the testimony.

We now take up in order the grounds urged for reversal:

I. THAT THE COURT ERRED IN HOLDING AS A MATTER OF LAW THAT PLAINTIFF'S CASE DID NOT ESTABLISH AN EQUITABLE LIEN, UNJUST ENRICHMENT OR A CONSTRUCTIVE TRUST.

This argument was presented to the trial court and disposed of in these words:

"With regard to the unjust enrichment, the Court can find nothing in the evidence to sustain that claim of the plaintiff—the buses, the money for their refurbishing, the expense, et cetera, were all furnished by Petteys, and the cases cited on unjust enrichment do not sustain the plaintiff's recovery on that ground.

"With regard to the equitable lien for services rendered, the Court feels that Marshall probably did render some service in this deal, but there is no evidence as to the value of these services, and the Court has no basis upon which to determine the amount of the

equitable lien or the value of the services rendered by the plaintiff in this case. They are vague and uncertain and do not form the basis of an equitable lien."

█ Clearly, it was contemplated by Marshall and Dyonisio that Marshall was to do something other than share in the profits of the bus deal. Marshall was a man of experience, versed in the ways of doing business in foreign lands, particularly in Brazil, but paramount was the fact that he was a man of means, able to finance the purchase price of buses ($397,500.00—plus cost of tires), freight, etc., ($52,000.00), refurbishing costs ($125,000.-00), deposit of good faith ($4200.00) and to supply Dyonisio with money for expenses incurred and to be incurred in seeking to make the sale to CMTC, first estimated at $40,000.00 and later determined to be $100,-000.00. The record fails to disclose that Marshall ever furnished any money for any of the above items or any other matter in connection with the deal, though he did loan to Dyonisio a total of $1830.00.

The foregoing items of expense and other items were eventually advanced by Petteys.

Marshall did write a few letters, sent a few telegrams, and did render a few services of undisclosed value, if any.

If there were any enrichment, just or unjust, it was limited to the undisclosed value of Marshall's services. Not one penny of Marshall's money, other than the loan to Dyonisio, ever reached the pockets of Petteys or Dyonisio. The trial court was correct in concluding that there was no evidence of unjust enrichment nor evidence on which to predicate a right to an equitable lien, there being no evidence of any amount due for services for which an equitable lien might arise.

II. Counsel state: "EQUITY WILL ENFORCE A PROMISE MADE TO INDUCE ACTION WHEN RELIED UPON BY THE PROMISEE."

Under this heading counsel state: "Under circumstances such as these, equity will not allow Dyonisio to

breach his promise, exclude Marshall from the transaction, and for Dyonisio and Petteys (who had notice of the arrangement) to take the profits of the transaction which would otherwise belong to Marshall."

Counsel for Marshall urge abstract propositions of law which are well founded, but foreign to the factual situation presented by the record. They shut their eyes to, and refuse to accept, the well founded findings of the trial court; among others:

"The Court also finds that the evidence adduced in this case shows that no mutual promises which the parties intended to be binding upon them were ever made; that Marshall, himself, was never bound to do anything mutually agreed upon by the parties.

"In short, the Court feels that the evidence in this case indicates that none of the parties ever bound themselves to each other to do that which all agreed were the duties of the parties. There can be no joint venture by operation of law. It must depend on the intention of the parties, and the Court finds that at no time did the three parties here ever have an agreement wherein mutual promises were exchanged, binding on all of them.

"Petteys, throughout the negotiations, refused to sign the agreements which were presented to him. Dyonisio and Marshall disagreed on the extent of Marshall's obligation to Dyonisio, and the evidence indicates to the Court that Marshall actually did not consider himself bound at any time to do anything. He signed a letter agreeing to pay expenses and then had his lawyers write an agreement which limited the amount of the expenses he would pay. When asked for expense money by Dyonisio, who had already spent a great deal of money in promoting the deal by way of travel and entertainment expenses totaling in the neighborhood of $20,000.00, he gave in small sums the total amount of approximately $2,000.00 and then advised that it was in the nature of a loan. As late as December, 1956, he attempted to nego-

tiate with another supplier of buses to sell those buses to Sao Paulo instead of Petteys' buses.

"It is the Court's finding that each of these three parties was jockeying with each other, unwilling to sign any contract which would be binding on all of them until such time as they were assured of the approval of the order by the Bank of Brazil, and that no joint venture, therefore, ever existed between these parties, and, therefore, none of these parties owed the duty which joint venturers owe to each other and which was so forcefully stated by Justice Cardozo in *Meinhard v. Salmon,* 249 N.Y. 458; 164 N.E. 545.

\* \* \*

"\* \* \* The best that the Court can find from the evidence is that the parties continued to negotiate until such time as Mr. Petteys declared the negotiations at an end; but there never was, the Court finds, a meeting of the minds on the essential parts of a joint venture agreement.

"It is unfortunate, if Mr. Marshall really wanted a joint venture agreement in this case, that he did not make such an agreement, exchanging his mutual promises with those of the other parties, before he proceeded to do those things which he says contributed to the obtaining of the order. The Court cannot, however, surprise parties into a joint venture agreement; they must, of their own accord, enter into the same."

III. "THE COURT ERRED AS A MATTER OF LAW IN FINDING THAT THE EVIDENCE IN THIS CASE DID NOT ESTABLISH A JOINT VENTURE BETWEEN MARSHALL AND DYONISIO."

The foregoing quotations from the findings of the trial court point out very definitely and in detail why and how Marshall and Dyonisio never reached any agreement as to what each should do or contribute to the end that the buses be sold. There was no agreement as to sharing of losses, they disagreed as to the amount

of reimbursement Dyonisio should receive for expenses incurred.

The fact that lawyers employed (by Marshall) to put in writing the supposed agreement of the parties, after days of negotiation and efforts to reconcile differences, met with complete failure in producing a document that the parties could agree on as defining their rights and duties, is rather strong evidence of lack of agreement. This lack of agreement is further emphasized by the fact that Dyonisio employed his lawyers to draw an agreement or agreements that would, according to his understanding, evidence the commitments of the parties. The efforts of these lawyers were futile—Marshall refused to sign and pointed out numerous provisions which he contends were never agreed upon.

■ Joint adventures are the result of mutual understanding and agreement between the adventurers. They do not arise by operation of law. It may well be that Dyonisio and Marshall hoped and intended to become joint adventurers in disposing of the buses. In this they failed. There was a minimum of mutual understanding and agreement between them and an overabundance of misunderstanding and disagreement. Without agreement there can be no joint venture. *Realty Development Company v. Feit*, 154 Colo. 44, 387 P. (2d) 898. We agree that the trial court properly concluded from the evidence presented that Dyonisio and Marshall never entered into a joint venture agreement, expressed or implied.

IV. THE COURT ERRED AS A MATTER OF LAW IN FINDING THAT THE EVIDENCE DID NOT ESTABLISH A JOINT VENTURE AMONG *PETTEYS*, *MARSHALL* AND *DYONISIO*.

■ What we have said in III, supra, is doubly applicable to this assigned error. Additionally, we point out that as between Petteys and Dyonisio the relationship was that of seller and buyer, Petteys having agreed to sell and Dyonisio to buy certain buses. As between

Petteys and Marshall we find nothing in the record to indicate that either ever agreed with the other to do anything. There were no mutual promises or understandings; neither obligated himself to the other. Petteys was obligated to Dyonisio only. Marshall, if obligated at all, was obligated to Dyonisio and not Petteys. If Petteys had any rights, they were against Dyonisio. If Marshall had any rights, they were against Dyonisio and not Petteys.

V. Here counsel urge:

"THE TRIAL COURT ERRED BY OVERRULING THE MOTION OF THE PLAINTIFF TO STRIKE ALL THE TESTIMONY OF PETTEYS AND IN DENYING PLAINTIFF'S MOTION TO REOPEN THE TRIAL FOR THE PURPOSE OF IMPEACHING DYONISIO. IN THE ALTERNATIVE, THE TESTIMONY OF PETTEYS AND DYONISIO CONTAINS SO MANY CONTRADICTIONS, MISSTATEMENTS, ADMITTED PERJURIES AND CONSTANT AND OBVIOUS EVASION THAT NO WEIGHT SHOULD BE GIVEN TO IT."

Two trial judges, each of whom heard much of the testimony, found that there was no substantial conflict in the evidence or dispute as to the facts. Counsel for Petteys take the position that there is no substantial conflict in the testimony. Counsel for Transit, in their brief, state:

"As stated by the trial court * * * and by Judge McWilliams in the preliminary injunction hearing * * * *the basic facts of the matter are not essentially in dispute. * * *.*" (Emphasis supplied.)

We find no basis for counsels' efforts to predicate error of the trial court in not striking testimony or granting leave to reopen in order to impeach certain testimony of Dyonisio.

If the "basic facts of the matter are not essentially in dispute," as stated by counsel, it is indeed difficult to see how counsel can complain of the evidence that es-

tablished those basic facts. One of the purposes of the trial was to establish the true facts.

In addition, after carefully reading the record, we do not share counsels' views as to the reliability of Petteys and Dyonisio and their testimony, nor do we share counsels' views that their testimony should be stricken or no weight given to it because unworthy of belief.

The trial judge heard the testimony, observed the witnesses and it was his function and duty to determine the credibility of the witnesses.

We find no merit in this ground urged for reversal.

From the record it appears that all parties were given great latitude in presenting documentary and testimonial evidence (none of the parties objecting) seeking to establish pertinent facts. The trial court found as a matter of fact and law that Transit had failed to establish any claim for relief against either Petteys or Dyonisio. We concur in such finding.

The judgment is affirmed.

MR. CHIEF JUSTICE McWILLIAMS and MR. JUSTICE PRINGLE do not participate.