508 P.2d 101

Arthur HELFENBEIN and Conn Aycock, Appellants,

v.

BARAE INVESTMENT CO., INC., an Arizona corporation; Albert Burke; Robert E. Hamilton; C. A. Piercey and R. E. Schlittenhart, dba Hamilton Farms, a partnership; Robyn Ann Hamilton Trust, a trust; R. E. Schlittenhart, Trustee of Robyn Ann Hamilton Trust; and Empire Farms Corporation, an Arizona corporation, Appellees.

No. 2 CA–CIV 1248.

Court of Appeals of Arizona, Division 2.

April 3, 1973.

Rehearing Denied May 2, 1973.

Review Denied May 29, 1973.

Burch, Cracchiolo, Levie, Guyer & Weyl, by Daniel Cracchiolo, Phoenix, for appellants.

Daughton, Feinstein & Wilson, by Allen L. Feinstein, Phoenix, for appellees Barae Investment Co. and Albert Burke.

Stanfield, McCarville, Coxon & Ishmael, by Thomas A. McCarville, Casa Grande, for appellees Robert E. Hamilton and R. E. Schlittenhart.

KRUCKER, Judge.

This appeal is concerned with a real estate commission arising out of a sale and option agreement of the Hamilton and Empire farms (hereinafter referred to as the farms), located in Pinal County, Arizona.

Appellants, plaintiffs below, instituted this action in February, 1970, against appellees, Robert E. Hamilton and R. E. Schlittenhart and others, as owners of the farms, and George Isaacs, Richard Krotz and John Saunders seeking real estate commissions on account of a sale and option agreement consummated on December 30, 1969, with Isaacs. In the same action, they joined as defendants Albert Burke and Barae Investment Company seeking one half of the commissions allegedly received by them.

Defendants Isaacs, Krotz and Saunders filed a motion to dismiss the amended complaint which was denied by the trial court. We subsequently reversed this ruling and directed entry of an appropriate order of dismissal. Isaacs v. Superior Court, 15 Ariz.App. 232, 487 P.2d 1044 (1972).

The case was tried to the court without a jury. Findings of fact and conclusions of law were neither requested nor made. From a judgment in favor of all defendants, plaintiffs appeal.

The facts stated in the light most favorable to sustain the judgment are as follows. In the latter half of 1968, Burke, a real estate salesman employed by Barae Investment Co., telephoned Aycock, a real estate salesman employed by Helfenbein, who was experienced in sales of large farm properties. He told Aycock he had a prospect named American Realty and Petroleum Co. (hereinafter referred to as AMRAP) who was interested in purchasing a large parcel of deeded land. Aycock contacted Schlittenhart, one of the owners of the subject farms, and after several weeks of negotiations, Hamilton and Schlittenhart gave to Helfenbein and Barae a listing agreement. The agreement, which was prepared by Burke, was signed by the sellers and the real estate brokers. It provided in part:

"Commission: Ten per cent (10%) of the gross sale price that is settled

upon between the buyer and seller, and is to be paid in a manner that is satisfactory to the seller and the real estate brokers who are parties to this agreement.

Listing: This open listing is your authority to present and show this property to American Realty and Petroleum Co. only, and to no other clients of yours without the sellers express consent. This open listing is cancellable at the sellers option, and such cancellation will be in writing. The commission must be paid however, in the event the seller and American Realty and Petroleum Co. enter into new negotiations and consummate a sale within two (2) years from the date of this listing and commission agreement."

Several weeks after the listing agreement had been signed, Aycock typed in the following on the agreement:

"Note: All sales commission from this listing agreement to be divided FIFTY = FIFTY PERCENT between listing Brokers."

This addition was never signed or initialed by Burke or Barae Investment Co. nor is there any indication that Burke or Barae knew of it. When asked why he didn't talk to Burke about it, Aycock stated, "The deal didn't materialize so it wasn't important." He also testified:

"Q. So now then the 50–50 split was typed in for some consummation of the AMRAP deal right?

A. Right.

Q. And had nothing to do with the Isaacs deal?

A. Right.

Q. And you knew that if anything came of the Isaacs deal it was a prepaid interest deal. It was a different deal than the AMRAP deal and even commissions had to be negotiated. You knew that, didn't you?

A. Yes."

The proposed deal with AMRAP died in February or March of 1969. In early November, 1969, Burke entered into discussions with George Isaacs, which ultimately led to the sale which is the subject of this litigation. Isaacs, who lived in Hawaii and California, had been a personal friend of Burke's for approximately thirteen years. He phoned Burke and indicated that he was interested in a "pre-paid interest deal" for tax reasons and expressed interest in a Pinal County property known as the C & V Farms. Burke advised him that this property was overpriced and mentioned the availability of the subject farm. Because Burke believed that Aycock thought C & V Farms was not a good value and because Aycock had knowledge of other available properties in Pinal County, he asked Aycock to talk to Isaacs on the phone and tell him his opinion of the C & V Farms. On November 20, 1969, Burke placed a long distance call to Isaacs and a three-way phone conversation among Aycock, Isaacs and Burke took place. During the course of this conversation, Aycock told Isaacs that he felt the C & V Farms was overpriced and that there were several other properties in Pinal County that would cost less. According to Burke, Aycock never specifically mentioned Hamilton Farms.

Thereafter, Aycock contacted Schlittenhart and Hamilton and asked them if they were interested in selling the farms with pre-paid interest. Both indicated they would. Burke testified that he never asked Aycock to call Hamilton or Schlittenhart about a possible deal with Isaacs nor even discussed with Aycock the possibility of Isaacs purchasing the farm in question. Also, he denied that a map which was used in the Isaacs transaction was prepared by Aycock. According to Burke, he never requested Aycock to do so and had made one himself.

Late in November Aycock called Burke and asked him what had happened on the C & V Farms deal. Burke told Aycock that Isaacs had resolved his tax problems since he was in the process of working out

a deal with UCLA or USC to transfer some California property to the school.

Because of this conversation, Aycock called Hamilton and Schlittenhart and told them that the pre-paid interest deal could not go through because the buyer had made some donation to a California school and was not interested in purchasing the Hamilton and Schlittenhart land. However, in the interim Isaacs phoned Burke and told him that the school deal might not materialize. He asked him to pursue further negotiations on the farm purchase.

On November 28, 1969, Burke talked to Schlittenhart about having a client who was interested in buying the farms with pre-paid interest. Schlittenhart said they were interested. In December, 1969, Burke introduced Richard Krotz, who was representing Isaacs, to Hamilton. In late December negotiations between the farm owners and Isaacs' representative began in Isaacs' attorney's office in Phoenix. Burke testified that he did not actively participate in any of these negotiations, that he was acting for Isaacs, and that he had so indicated this to Hamilton and Schlittenhart.

On December 26, 1969, a transaction consisting of a sale and option agreement for these two farms was consummated between Hamilton, Schlittenhart and Isaacs. The sales price was $2,600,000 and the option price was $3,120,000 if the option was exercised. Simultaneous with the closing of this transaction, Hamilton and Schlittenhart executed a commission agreement wherein they agreed to pay to Isaacs' attorney ten percent of the sales price and ten percent of the option price if it was exercised. Thereafter, Isaacs' attorney instructed the escrow agent to pay all commissions he was to receive to a corporation known as George Isaacs Hawaii Ltd.

From the down payment made by Isaacs, approximately $15,000 commission was paid to him out of which Burke received $7,500.

Although Burke refers to this payment several times in his testimony as "commission", he also testified that this sum was paid pursuant to an oral agreement entered into after this original complaint was filed for which he is obligated to perform substantial services and is entitled to additional compensation. Thereafter, Burke entered into an oral arrangement with Isaacs whereby Burke was to receive one-half of all commissions received by the Isaacs corporation.

The sole question we are asked to consider is whether Burke and Aycock are joint ventures respecting the sale of the Hamilton and Schlittenhart farms to George Isaacs so that a real estate commission paid should be equally divided between sharing brokers.[1]

A joint venture (or as sometimes called, adventure) is a special relationship between two or more parties to engage in and carry out a single business venture for joint profit without any actual partnership or corporation designation. Arizona Public Service Co. v. Lamb, 84 Ariz. 314, 327 P.2d 998 (1958); Ruby v. United Sugar Cos., 56 Ariz. 535, 109 P.2d 845 (1941). Such relationship which arises out of express or implied contract is founded upon mutual understanding and agreement between the adventurers. West v. Soto, 85 Ariz. 255, 336 P.2d 153 (1959); Transit Equipment Co. v. Dyonisio, 154 Colo. 379, 391 P.2d 478 (1964); Refrigeration Engineering Co. v. McKay, 4 Wash.App. 963, 486 P.2d 304 (1971), and arises only where they intend to associate themselves as such. 46 Am.Jur.2d Joint Ventures § 9. Such intent may be inferred from the acts and conduct of the parties. Holtz v. United Plumbing & Heating Co., 49 Cal.2d 501, 319 P.2d 617 (1957); Bender v. Bender, 144 Mont. 470, 397 P.2d 957 (1965).

Resolution of this issue is for the trier of fact. San Francisco Iron & Metal Co. v. American Milling and Industrial

1. At oral argument appellants conceded they have no claim against any of the appellees but Burke and Barae.

Co., 115 Cal.App. 238, 1 P.2d 1008 (1938); Miller v. Boma Inv. Co., 112 Colo. 7, 144 P.2d 988 (1944); Kelty v. Best Cabs, 206 Kan. 654, 481 P.2d 980 (1971).

In the absence of express findings of fact, we must presume the trial court found every controverted issue of fact necessary to sustain the judgment, providing there was evidence in the record to support the same. Kellogg v. Bowen, 85 Ariz. 304, 337 P.2d 628 (1959); Funk v. Spalding, 74 Ariz. 219, 246 P.2d 184 (1952); Fleming v. Becker, 14 Ariz.App. 347, 483 P.2d 579 (1971).

Appellees concede the possibility of a joint venture as to the AMRAP transaction but argue that it did not extend to the sale of this property more than one year later to Isaacs. Appellants, however, contend that the 1968 listing agreement, coupled with Aycock's activities after the AMRAP deal had failed, demonstrate a joint venture. The trial court did not agree and our review of the record leads us to conclude that its resolution of the joint venture issue is supported thereby. Aycock knew that the 1968 listing had nothing to do with the Isaacs deal. Merely because he was asked to give Isaacs his opinion of the C & V property does not establish a joint venture. Were we to accept appellants' argument, any real estate agent who rendered assistance to another agent would be entitled to share in the latter's commission.

As to the listing agreement, we fail to see how it points to a relationship between Burke and Aycock, *inter sese,* it does nothing more than establish an obligation of the seller to pay a commission to their respective brokers. Aycock's reliance on the preparation of a map and his phone call to Hamilton concerning a pre-paid interest deal is likewise without substance, such activities not having been rendered at Burke's request.

Appellants' final contention concerns Burke's alleged breach of a fiduciary duty. Having resolved the joint venture issue adversely to appellants' position, we need not address ourselves to this question. There being no relationship established, there can be no duty.

Judgment affirmed.

HATHAWAY, C. J., and HOWARD, J., concur.