RUDOLPH R. BENDER, F. W. (BILL) BENDER, VICTOR
BENDER AND GUS BENDER, PLAINTIFFS AND APPELLANTS,
*v.* IRENE L. BENDER, INDIVIDUALLY, AS ADMINISTRATRIX OF
THE ESTATE OF EDWIN H. BENDER, DECEASED, AND AS GUAR-
DIAN OF THE ESTATE OF EDWIN LYLE BENDER AND MARILYN
BENDER, MINORS, EDWIN LYLE BENDER, MINOR, MARILYN BEN-
DER, MINOR, AND EVONNE (BENDER) INKS, DEFENDANTS
AND RESPONDENTS.

No. 10718.
Submitted September 16, 1964. Decided January 7, 1965.
397 P.2d 957

472

Michael J. Whalen (argued), Billings, Ernest F. Boschert (argued), Billings, for appellants.

Lamey, Crowley, Kilbourne, Haughey & Hanson, Gerald F. Krieg (argued), Billings, for respondents.

MR. JUSTICE DOYLE delivered the Opinion of the Court.

This is an appeal by plaintiff and appellants, Rudolph R. Bender, F. W. (Bill) Bender, Victor Bender and Gus Bender, from a judgment and decree in favor of Irene L. Bender and her three children, Edwin L. Bender and Marilyn Bender, minors and Evonne Bender Inks.

This is an equity case involving a dispute over ownership of the business denominated as the Bender Auction Market, hereinafter referred to as "Market," located in Billings, Montana, and the assets thereof. The dispute involves one general question: Whether the Market was a sole proprietorship owned by Edwin Bender, or a partnership between Edwin Bender, now deceased, and his four brothers, appellants here. The district court made findings and conclusions going to the general dispute, but we shall not burden this opinion with a recital of each, but shall discuss them generally.

Specifically, the property in dispute, both real and personal, is as follows:

(1). Lots 17-24, inclusive, Block 65, Original Town, now City of Billings, Yellowstone County, Montana;

(2) Lots 13-22, inclusive, Block 28, Original Town, now City of Billings, Yellowstone County, Montana;

(3) Lots 23 and 24, Block 28, Original Town, now City of Billings, Yellowstone County, Montana;

(4) The business of Bender Auction Market, 1123 Third Avenue North, Billings, Montana, with its office equipment, fixtures and inventory of goods and merchandise;

(5) Bank deposits of $56,749.25 and $7,120.12 on deposit in the First National Bank and the Security Trust and Savings Bank, respectively, at the date of Edwin Bender's death.

There is no dispute that in an equity case this court should review the evidence as well as the law, however, its review is limited to the extent necessary to determine whether there is substantial evidence to support the findings of fact made by the trial court and if such findings are sufficient to support the conclusions of law based thereon. Weakley v. Cook, 126 Mont. 332, 336, 249 P.2d 926; R.C.M.1947, § 93-216; Haynes v. Fillner, 106 Mont. 59, 75 P.2d 802; Poepping v. Monson, 138 Mont. 38, 353 P.2d 325, rehearing denied 354 P.2d 183.

To determine whether the trial court was in error, it is necessary for us to review briefly the history of the Market, and in particular its operation since 1934. The Market was originally established in 1919 by J. H. Bender, Fred Bender, brothers, and H. N. Thomas in Billings, Montana. Shortly thereafter, Fred Bender and Thomas withdrew and J. H. Bender, continued, alone, to operate the business. In the year 1919 when the Market was first established J. H. Bender had five sons, whose names and ages were as follows: F. W. (Bill), 16 years; Rudolph, 13 years; Gus, 11 years; Edwin, 8 years; and Victor, 3 years. The Market was operated continuously throughout the 1920's by the father with his sons undoubtedly assisting with the business in some measure; the eldest son, F. W. (Bill) Bender, hereinafter referred to as Bill, having left school assisted fulltime.

There is conflicting evidence as to whether the business was interrupted at sometime during the years 1934-1935. Appellants testified that the business was established in 1919; that it was a family business; that it was intended to be operated

as a "family unit;" and that its operation had been continuous and uninterrupted until the present time. Testimony of the respondents' witnesses, however, indicated that in 1934 the Market was all but defunct; that the father, J. H. Bender, withdrew from the business, and thereafter, in the Spring of 1935, Edwin Bender assumed control of the Market, which control continued without interruption until his death on January 4, 1960. The trial courts so found. There is evidence that Gus, Bill, and Victor Bender did perform services for the Market and that they were compensated for such services by checks drawn against the Market and which were signed by Edwin Bender. It also appears from the record that prior to 1946 Bill, in addition to Edwin, was authorized to sign checks drawn against the Market account, however, subsequent to 1946 the only persons authorized to do so were Edwin and his wife, Irene.

In connection with the actual operation of the Market, it is worthy to discuss the activities of each of the brothers in regard thereto.

As to Rudolph Bender, it is doubtful that he ever participated in the operation of the Market, except as a boy. The evidence indicates that by the year 1930 he was engaged in farming. Respondents' witnesses testified that while they sometimes saw Rudolph at the Market, they did not see him working there. Rudolph testified that he had contributed money to the Market and in support of this testimony plaintiffs offered into evidence several checks drawn by him in favor of the Market. However, these checks have inscribed on their faces in the left-hand corner an item of merchandise for which, presumably, the check was given. Thus the exhibits offered by the appellants support equally the contention of the respondents that the checks were given, not as contributions, but as payment for goods purchased by the appellant from the Market. Further, the record reveals that within two weeks after Edwin's death Rudolph proclaimed an interest in the Market; yet no claim

was presented until December, 1961, over a year later, when this cause was filed and after David Good, a long-time employee of Edwin's at the Market, had died in May, 1961. Thus, what indirect evidence there is to establish Rudolph's partnership interest is contradicted by a preponderance of evidence from the respondents. There is no documentary evidence which supports directly the contention that Rudolph was a partner in the Market. Rudolph does now own an undivided one-half interest in lots 13-22, previously described; this interest however, was acquired by purchase from Victor subsequent to Edwin's death. Victor testified at trial that the consideration for the transfer was $3,000; however, by pre-trial deposition, Victor testified that the consideration had been $6,000. In any event, the fact that consideration was paid plainly negatives the argument that either Victor or Rudolph were holding the property in trust for a family business or that they had dealt with the property in any way other than one in which they had exclusive ownership untrammeled by any fiduciary or trust relationship.

Gus Bender's direct testimony in regard to the early history of the Market and the participation of the brothers in its operation conforms generally to the direct testimony of the other plaintiffs. It developed on cross-examination, however, that Gus had had considerable employment which was unrelated to the business in dispute. In addition to employment in grocery stores, the sugar factory, and Yellowstone Park, Gus had also actively engaged in farming and by the year 1947 had acquired by purchase farmlands in excess of 1,000 acres. In 1946, Gus attended an auction school in the east; thereafter, he returned to Billings and from that point the evidence indicates that auctioneering at the Market was his principal capacity whenever he spent any time there. He acknowledged that he was paid for these auctioneering services, and the payments, which were made before Edwin's death, exceeded $5,000. He also acknowledged on cross-examination that he had never declared

any profits from the Market on his tax returns; that he had never contributed cash to the purchase of any of the real property; nor had he ever paid any of the taxes thereon. Moreover, Gus' creditor's claim which was filed against Edwin's estate, and which was paid ($4,128.38), was for wages due for the period 1952-1959. The appellants produced no documentary evidence which, directly or otherwise, tended to establish the existence of a partnership and Gus' participation therein.

As to Victor Bender, there is conflicting evidence as to the extent of his participation, if any, in the operation of the Market. It appears from the record that he occasionally did work at the Market, but there is also testimony that he was paid for such services. Victor spent World War II in the United States Army, a part of that time as a captive in a German prisoner-of-war camp. Upon his return to Billings he was suffering from shock, etc., which has permantly affected his mental stability. In 1951, Victor acquired by warranty deed from his mother, Anna Bender, an undivided one-half interest in lots 13-22, inclusive, of the aforementioned real property. These lots were originally acquired by the Market by deed from Yellowstone County, dated February 14, 1939, which named as grantees, Edwin and Anna Bender. Thereafter, in 1955 Edwin and his wife, Irene, acquired as joint-tenants the adjacent lots, nos. 23-24, by quit-claim deed from E. C. Eliason. Subsequently, in 1955 or 1956 Edwin caused a building to be constructed on lots 22, 23 and 24. In 1956 Victor executed a warranty deed attempting to convey his undivided one-half interest to Edwin; the conveyance failed however, for lack of delivery of the instrument. Shortly after Edwin's death, Victor submitted a creditor's claim in the amount of $8,774.36 for rentals allegedly due him for the period of July 1956 to January 1960. This claim was rejected. It was shortly after this that Victor conveyed the subject interest to Rudolph for the consideration previously discussed.

Bill Bender assisted in the management of the Market in

varying degrees during the years following 1935. He worked at the Market and was compensated for those services. There is a conflict in the evidence as to whether the compensation was in the form of wages or whether it was sharing in the profits of the business as a partner. During World War II he did not work at the Market but was engaged in other employment which was unconnected with the Market. Since the end of World War II he has worked at the Market occasionally but has also been engaged in farming and has lived periodically in the State of Oregon and was there residing at the time of Edwin's death. There is conflicting evidence as to the state of the Market during the war. Appellants insist that it did only limited business due to O.P.A. controls and other wartime restrictions on buying and selling, thus accounting for the fact that during that time Bill Bender sought other employment. Respondents maintain that the business continued to operate and that it handled substantially the same volume of business throughout the period. The gross receipts of the Market, as indicated by the tax returns filed by Edwin Bender for those years do not, for the most part, reveal any substantial variance and tend to support the respondents' position. As we noted before, subsequent to 1946 Bill Bender was no longer authorized to draw checks against the Market accounts.

In further support of the position that no partnership existed as between the brothers the respondents introduced testimony at trial which tended to establish that shortly after Edwin's death Bill disclaimed any interest whatsoever in the Market or its assets. This was denied at trial. The most persuasive evidence of the existence of a partnership, at least as between Edwin and Bill Bender, were the tax returns which were filed for the twenty-year period, 1939-1958. We shall discuss these later in another connection.

In contrast to the sporadic, temporary and apparently lackadaisical conduct of the appellants with regard to the operation of the Market, the record discloses that the time and en-

ergies of Edwin Bender throughout his adult life were devoted for the most part to the management, development and expansion of the Bender Auction Market. The record reveals that subsequent to 1934 Edwin consistently treated the property as his own. He paid personal and business expenses from the accounts established in the name of the Market. There is no evidence that Edwin ever received compensation in the form of wages from the Market; it clearly appears that the members of his family never received wages for their services rendered in connection with the operation of the Market. Edwin apparently drew upon the profits of the Market whenever and in whatever amounts he deemed desirable. With the exception of goods placed in the Market on consignment, neither Edwin nor his wife ever accounted for merchandise acquired by them from the Market for their own personal use. Edwin paid the real estate taxes on the property; leased portions of that property to the federal government; mortgaged the property to secure loans, covenanting therein that he was the owner thereof; and entered into a contract for the construction of a building on the property without ever indicating that any of the appellants had any interest therein. Moreover, the record is barren of any evidence that the appellants, or any of them, ever incurred any liability in connection with these transactions.

Considerable evidence, much of it contradictory in nature, was admitted which related the acquisition or ownership of the assets of the Market. These properties will be discussed in the order in which they are set out. At the time of the death of Edwin Bender, it is undisputed that at all times relevant herein the real property involved was in the name of Edwin Bender or Edwin and Irene Bender, as joint tenants, with the exception of the undivided one-half interest in lots 13-22, block 28.

Lots 17-24 were purchased pursuant to a contract for deed in 1934 by J. H. Bender and his son, Edwin. Thereafter, in 1934, J. H. Bender quitclaimed his interest to Edwin and,

subsequently, in 1938, Edwin acquired title by warranty deed. In 1956, Edwin's title was changed to a joint tenancy between him and his wife, Irene, a respondent here. There are three buildings situated on this property. The evidence is conflicting and confusing as to how the construction of the buildings was financed. Appellants insist that all the brothers were instrumental in the financing and construction. Respondents, contrariwise, maintain that Edwin was principally responsible for all phases of the acquisition. There is, as we noted before, considerable documentary evidence in support of the respondents' contention that Edwin was solely responsible for the financing of the construction and that he alone assumed the liability therefor.

The real property denominated as lots 13-22 was acquired by tax sale in 1934 for $200. Title was recorded in the names of Edwin and his mother, Anna Bender. Anna Bender conveyed her undivided one-half interest to her son, Victor, by warranty deed in 1951. Thereafter, in 1956, Victor executed a warranty deed conveying his interest therein to Edwin, but, as previously noted, the transaction was never completed, and subsequently Victor successfully conveyed this interest to his brother, Rudolph, shortly after Edwin's death. Rudolph is the present owner of this interest; Irene Bender and her three children, the respondents here, are the owners of the remaining one-half interest, subject to the administration of the estate of Edwin Bender.

Lots 23 and 24 were purchased under contract for deed dated October 20, 1955, and naming as grantees Edwin and Irene Bender, husband and wife, as joint tenants, with the right of survivorship. The terms of this contract had not been completely fulfilled at the time of Edwin's death; however, the payments, which totalled $5,000, that had been made, were all paid by Edwin Bender.

As to the bank accounts in which the appellants allege to have an interest, the evidence indicates that at the time of Ed-

win's death the only persons authorized to draw against such accounts were Edwin and his wife, and that such authorization had been limited to them since 1946. The evidence also reveals that monies which had been earned by Edwin Bender from his other enterprises such as farming and custom combining had been deposited in these accounts and commingled with the profits arising from the operation of the Market.

It was the task of the trial court to resolve the inconsistencies which were presented by the evidence of appellants and respondents. There is no doubt that the burden is on appellants to prove the existence of a trust, partnership, or joint venture, and of showing what property, if any, was affected thereby. Trusts must be founded on evidence which is unmistakable, clear, satisfactory and convincing. (Platts v. Platts, 134 Mont. 474, 334 P.2d 722) To establish joint venture or a partnership, it is necessary to determine the intent of the parties; such business relationships arise only when the parties intend to associate themselves as such. There must be some contribution by each co-adventurer or partner of something promotive of the enterprise. There must be a joint proprietary interest and a right of mutual control over the subject matter of the enterprise or over the property engaged therein, and there must be an agreement to share the profits. (Rae v. Cameron, 112 Mont. 159, 114 P.2d 1060; Weiss v. Hamilton, 40 Mont. 99, 105 P. 74.) The intention of the parties has to be clearly manifested, (Larson v. Robinson, 136 F.Supp. 469 (D.C. Mont., 1955).) and must be ascertained from all the facts and circumstances and the actions and conduct of the parties. (Porter v. Moore, 130 Mont. 259, 300 P.2d 513; see also R.C.M.1947, § 63-107, for rules determining the existence of a partnership.)

Having stated that the burden of proof is upon appellants to show that a trust, partnership or joint venture exists, and also having stated what it is necessary to prove, it is imperative to state another rule, consistently followed by this court. The doctrine is well-stated in Bouma v. Bynum

Irrigation District, 139 Mont. 360, 364, 365, 364 P.2d 47, 49, 50, where this court said:

"Prior to an examination of this allegation of error, the rules which govern review by this court in an equity appeal should be considered. Under section 93-216, R.C.M.1947, it is the duty of this court to review all questions of fact arising upon the evidence presented from the record. *However, this statute has been subject to the judicial doctrine that this court in reviewing equity cases will hesitate to overturn findings of the trial court based upon substantial conflicting evidence which would justify an inference in favor of either side of the controversy.* This rule is founded on the practicality that the trial court occupies an advantageous position. [Citing cases.]

"In Havre Irrigation Co. v. Majerus, 132 Mont. 410, 414, 318 P.2d 1076, 1078, we stated: '* * * this court indulges [in] the presumption that the judgment of the trial court is correct, and will draw every legitimate inference therefrom to support the presumption.' See also George v. Fish Creek Irrigation Ditch Co., 135 Mont. 490, 342 P.2d 738.

" 'The burden is upon the appellant to show that the evidence *preponderates* against the finding.' Thomas v. Ball, 66 Mont. 161, 165, 213 P. 597, 598." (Emphasis supplied.)

Thus, appellants must show that the evidence preponderated against the findings of the lower court. There are two matters that were presented by appellants which seem at first blush to be inconsistent with those findings, namely, the ownership by Victor Bender of an undivided one-half interest in lots 17-24 at the time when Edwin Bender had constructed a building thereon, and the filing by Edwin Bender of income tax returns in partnership form which named himself and his brother, Bill, as partners.

Admittedly, the ownership interest of Victor in the real property, without more, might be considered evidence of an existing trust, partnership or other fiduciary relationship as between Victor and Edwin at the time that the buildings were

constructed thereon. However, when this fact of ownership is viewed against the background of evidence relating to the manner in which Victor dealt with the property, then the appellants' argument that Victor was holding the property in trust for the "family business" becomes less persuasive and the evidence thereon loses much of its probative force. As was previously noted, respondents' evidence on this point established that Victor had attempted to convey his interest to Edwin at about the time that the building was placed on the property; that after Edwin's death Victor submitted a claim against the estate for rent due on the property; and, finally, that shortly after Edwin's death, Victor conveyed the interest to Rudolph for a valuable consideration. Certainly, in view of these facts we cannot say that the trial court erred and that the plaintiffs' proof preponderated against its findings.

As to the income tax returns, it is undisputed that they were partnership returns for the Market during the period of 1939 to 1958, inclusive, and that those returns did name Edwin and Bill Bender as partners in the business. We think, however, that this evidence falls far short of establishing a partnership as between all the brothers. Moreover, Bill denied any knowledge of the tax returns or of his appearance thereon as a partner. An examination of those returns reveals that, with the exception of some of the earlier years, the income of the business was not divided equally as might be expected in an equal partnership. Income was divided equally during the years 1939-1943; however, during the period 1944-1947, Bill was shown to be not entitled to any part of the income from the Market. Beginning again in 1948, the shares of Bill Bender are shown in varying amounts, with the exception of the years 1950, 1952 and 1954 in which no income was shown for him. Respondents have suggested, and we think it plausible, that the partnership returns were filed prior to World War II because both Edwin and Bill, but not the remaining brothers, were then devoting most of their time to the business and were sharing

the income therefrom equally; that after the commencement of World War II, Bill left the Market and the practice of filing partnership returns continued, although in fact the only sums shown as Bill's shares were the sums actually paid him as *wages*. In other words, it would seem that Bill was only a partner in the sense that he was sharing in part of the profits by receiving his compensation as wages and not as compensation for any proprietary interest. Again, conceding that these returns do constitute evidence of a business relation other than a sole proprietorship they do not, either by themselves or in connection with the facts surrounding Victor's property interest, establish a preponderance of evidence sufficient to overturn the findings made by the court below.

In summary, there are several facts supported by the record which make tenable the conclusion that the Market was a sole proprietorship owned by Edwin Bender, the deceased. Appellants never paid taxes on the income from the Market, nor did they ever pay taxes on any of the property herein involved; all such taxes were paid by the deceased without reimbursement by appellants. Appellants, with the possible exception of Bill Bender, acknowledged that throughout the entire history of the Market they never shared nor participated in the profits earned by the business other than receiving compensation for services rendered. Victor Bender, while holding title to some of the real property interests herein involved, obviously dealt with that property in a manner inconsistent with recognized trust or fiduciary principles. Gus Bender presented a claim against Edwin Bender's estate for wages due him for auctioneering services rendered at the Market. This claim was paid by a check drawn upon the Bender Auction Market and at the time of endorsement the following language appeared over Gus Bender's signature: "endorsement of this check constitutes a release in full of all claims against the estate of Edwin Bender, deceased." The presentment of this claim and the subsequent endorsement of a check carrying the

unequivocal language just quoted is, we think, more than ample evidence to support the conclusion that the business was a sole proprietorship rather than a partnership and the appellant, Gus Bender, so regarded it. There is substantial evidence that each of the plaintiffs had made statements in the past disclaiming any interest in the Market or in the properties recorded in the names of Edwin and Irene Bender.

Finally, from a careful perusal of the record, it is evident that Edwin Bender, the deceased, managed the business as his own. He incurred liability solely in his name when he borrowed money or contracted to have a building constructed for the business. The property in question was at all times recorded in the name of Edwin or in his and his wife's name as joint tenants. Appellants attempt to justify their failure to adjudicate their purported rights to the business and their lack of participation in the business profits on the grounds that they "trusted" the deceased to handle the business for them and that they thought the business was not operated at a profit. In view of the land acquisitions, the buildings constructed thereon and the appellants' presence in the Market, where they could observe the volume of business being conducted and, presumably, had access to some, if not all of the business records these arguments, we think, are something less than persuasive.

The remainder of appellants' specifications of error relate to the refusal of the court below to admit two of appellants' exhibits and rejection of an offer of proof. Appellants' exhibit no. 38 was a letter from appellants' mother to Victor which tended to show that, at the time Edwin and his family were in California on vacation, Bill and Gus Bender were in charge of the Market; appellants' exhibit no. 39 was a statement from an insurance agency which appellants offered as proof of reputation of the business as a partnership. Both were rejected by the court, and rightly so. (See sections 93-401-27, subd. (4), and 93-401-9, R.C.M.1947; 5 Wigmore (3rd. Ed.) Evidence, § 1624.) The appellants' offer of proof in connection

with Rudolph Bender's testimony was made for the purpose of establishing that the legal title to the disputed property was continued in Edwin Bender's name to facilitate financing. Inasmuch as the question propounded called for a conclusion and opinion on the part of the witness and also had reference to transactions with a deceased person the court did, as a matter of discretion, properly refuse to hear it.

We find no error, and must conclude that for the foregoing reasons the judgment be affirmed.

It is so ordered.

MR. CHIEF JUSTICE JAMES T. HARRISON, and MR. JUSTICES CASTLES, JOHN CONWAY HARRISON, and ADAIR concur.