No. 12262

IN THE SUPREME COURT OF THE STATE OF MONTANA

1972

---

FIRST NATIONAL BANK OF TWIN BRIDGES,

Plaintiff and Respondent,

-vs-

ARTHUR H. SANT and EDNA SANT,

Defendants and Appellants.

---

Appeal from:   District Court of the Fifth Judicial District,
Honorable Frank E. Blair, Judge presiding.

Counsel of Record:

For Appellants:

Landoe and Gary, Bozeman, Montana.
Ronald Olson argued, Bozeman, Montana.

For Respondent:

Chester L. Jones argued, Virginia City, Montana.

---

Submitted: December 1, 1972

Decided: FEB 16 1973

Filed: FEB 16 1973

Thomas J. Kearney
Clerk

PER CURIAM:

This is an appeal from a judgment entered in the district court of the fifth judicial district, county of Madison, following trial to the court sitting without a jury. Judgment was rendered in favor of plaintiff First National Bank of Twin Bridges, granting it foreclosure including costs and reasonable attorney fees, against defendants Arthur H. Sant and Edna Sant, who had mortgaged various real and personal property as collateral for a loan from the bank.

Hereinafter, plaintiff will be referred to as the Bank; defendants will be referred to as Sant.

It appears from the record that on July 9, 1970, Sant owed the Bank a balance due on existing notes and also owed creditors a considerable amount of money. On that day, Sant signed and entered into a mortgage with the Bank whereby Sant gave to the Bank a mortgage on land in Madison County to secure payment of three promissory notes. The face value of the respective notes was $17,690.62, $12,968.74, and $2,788.05, with each bearing interest at the rate of ten percent per annum. At the time the mortgage was executed and the notes signed, the president of the Bank, Paris Robert, presented to Sant a written plan entitled "Plan of Paris Robert", for the disbursement of the funds made available to Sant by virtue of the notes that had been signed. Sant signed the disbursement plan and it was mutually agreed the Bank would make the payments to the various creditors as per the disbursement schedule. The schedule, plaintiff's exhibit 5, is herein set forth:

"(Plan of Paris Robert)

"Arthur H. Sant
Edna Sant

"July 9, 1970                                    Work-out Statement
     * * * * * * * * * * * * * * * * * *

"PAYING: WITH CASH ADVANCES ON NOTES AT TWIN BRIDGES BANK
    First National Bank of Twin Bridges
    Renewal of balances:   dt 6/17/70   $1000.00
                           dt 6/16/70    1500.00
                           dt 8/20/69    4808.09
        Interest on above notes:           26.48   $7334.57
        Expense to this time:                        50.00   $7,384.57

    Russell Lepp and/or Continental Oil Co.
        Partial payment                                       5,000.00

Williams Feed Co. Dillon: OLD   $1821.59
                   '70 buys.     1160.00                       2,981.59

Peavy co. Manhattan      Bal   $ 495.74                          495.74

Robert Insurance Agency, Whitehall   717                         717.00

1st Nat'l Bank   Great Falls-Sprinkler                           401.29

Idaho 1st Nat'l, (Shelly) (Bob Gibbons) Crawler tractor          357.40

Idaho 1st Nat'l, Idaho Falls      Harvestor potatoe              353.03

            Main Note Due 2/5/71                              17,690.62

"PAYING, with Notes, owned by:   but as subdinated partners
                                 in collateral:

    Continental Oil Co. via Russell Lepp (due 2/5/71)         2,788.05

    A.R.Smith:   Old note   $8240.00
          Int. above         728.74
          1970 lease        4000.00   $12,968.74

        Int. on Renewal from maturity:
        New note matures 4/1/71 - - - - - - - - - - - 12,968.74

                                                           $33,447.41


"APPROVED FOR DISBURSEMENT   7/9/70

"S/ Arthur H. Sant                      Collateral: 2nd Mortgage on RE.
_____                            Crop & Machinery
                                                   Mortgaged via Security
_____                            Agreement.

                                                   3 Vehicles."

        Following the signing of the three notes, the mortgage, and

the disbursement schedule, all on July 9, 1970, seven checks were

written by Paris Robert on the "Officer's Special Account" of the

First National Bank of Twin Bridges, in these amounts:

- 3 -

| PAYEE | AMOUNT |
|---|---|
| Russell Lepp | $5,000.00 |
| Williams Feed Co. | 2,981.59 |
| Peavy Co. | 495.74 |
| Robert Ins. Agency | 647.00 |
| 1st Nat'l Bank-Great Falls | 401.29 |
| Idaho 1st Nat'l Bank - Shelley | 357.40 |
| Idaho 1st Nat'l Bank - Idaho Falls | 353.03 |

One additional check was written by Paris Robert on this account payable to the order of "Deposit Art Sant Acct" for $70.00. This was explained as the difference between the debt to Robert Insurance Agency of Whitehall in the amount of $717.00 listed in the "Plan of Paris Robert" and the check actually written to Robert Insurance Agency of $647.00.

The trial court's findings of fact indicate that Paris Robert in making the seven disbursements to creditors had certain negotiations with three of the creditors without the knowledge or consent of Sant. As a result of these negotiations Robert caused the following rebates to be made to the Bank:

| CREDITOR | AMOUNT | % OF PAYMENT |
|---|---|---|
| Russell Lepp | $750.00 | 15% |
| Williams Feed Co. | 364.32 | 20% |
| Peavy Company | 100.00 | 20% |
| | $1,214.32 | |

At trial Paris Robert testified that the negotiations with these three creditors concerning the rebates were simultaneous with those with Sant regarding the loan. He did admit, however, that they were not revealed to Sant.

The trial court's findings of fact did not consider the question of whether the three creditors involved in rebates knew the Bank had or was in the process of obtaining, secured notes from Sant covering the entire amount of the indebtedness nor whether they knew Paris Robert was acting without Sant's knowledge or consent in seeking the rebates.

One of the three creditors, Russell Lepp, testified that at the time he agreed to make the rebate, he felt he was under pressure to take what he could get.

From the record, it appears the notes for $2,788.05 and $12,968.74 were held by the Bank and no actual disbursement was made to Continental Oil Co. via Russell Lepp or to A.R. Smith, both of whom were listed as corresponding creditors to these notes on the "Plan of Paris Robert". These pencil notations appear on the right hand margins of the notes:

| NOTE AMOUNT | NOTATION |
|---|---|
| $2,788.05 | Russell Lepp-Whitehall |
| $12,968.74 | A.R. Smith Trust |

Paris Robert testified these pencil notations were made by him for the purpose of indicating, although the Bank was payee on the notes, that they were held in trust for the two persons indicated.

The findings of fact disclose that none of the three notes was paid on the due date. At the time this foreclosure action was brought the only payments which had been made were $1,542.86 for interest and $27.64 on the principal. A.R. Smith died prior to commencement of the trial. After the action was commenced, an additional $2,600 was credited to the principal of the $2,788.05 note.

Two assignments of error are presented on appeal. First, regarding the disbursements made to creditors under the largest note, Sant contends the Bank as agent breached its ficuciary duty to Sant as principal, in seeking and obtaining rebates from three creditors, and consequently the Bank is entitled to no relief from a court of equity. Second, with regard to the two smaller notes, Sant contends these notes were not supported by legal consideration and the Bank was not a party in interest, consequently the Bank was not entitled to judgment ordering foreclosure.

The first issue pertains only to the largest of the three notes and the disbursements made thereunder. The Bank on appeal contends it became Sant's special agent only for the limited purpose of disbursing funds to creditors in accordance with the written

- 5 -

authority Sant gave when he signed the "Plan of Paris Robert".
In this contention it is correct. The Bank then contends the
duties of this limited or special agency were carried out and
discharged when the Bank's president wrote the checks to the
seven creditors for the full amounts of their respective debts
and that any prior, contemporaneous, or subsequent action of
seeking rebates from these creditors was a separate function in
the interest of the Bank and not related to or in breach of its
special agency duties to Sant. In this contention, it is in
error.

The granting of the loan, the payment of the creditors
under the "Plan of Paris Robert", and the taking of "rebates"
or "expenses" from the creditors were not separate and distinct
transactions; rather, they were inextricably related parts of the
same transaction. In light of the total economic realities of
the situation then existing between Sant, his creditors, and the
Bank, the separate and distinct transactions theory propounded by the
Bank is not supported by the record.

The fact the Bank's agency status was of a special or
limited character has been relied upon by the Bank to support its
contention that it bore no fiduciary responsibilities to Sant.
This contention is also erroneous. The fact that an agency re-
lationship is of a limited or special nature does not extinguish
the fiduciary duty, but rather that fiduciary duty is limited in
scope and operation to the same degree as the agency to which it
applies. Virtually any relationship between a principal and agent
will have some limitation in the degree of authority and scope of
purpose. 3 C.J.S. Agency § 138, states the general rule:

> "As has been pointed out in § 1 of this Title,
> the relationship existent between principal and
> agent is a fiduciary one, demanding conditions
> of trust and confidence. Accordingly, in all
> transactions concerning or affecting the subject
> matter of his agency, it is the duty of the agent
> to act with the utmost good faith and loyalty for
> the furtherance and advancement of the interests
> of the principal." (Emphasis added).

In the instant case, the subject matter of the agency was of a special limited nature, i.e. making disbursements to creditors designated under and in accordance with the "Plan of Paris Robert". We find the Bank did not "act with the utmost good faith and loyalty for the furtherance and advancement of the interests of the principal" Sant.

It would appear from the trial court's "Basis of Decision", p.2, para. VI, that it reached a similar conclusion but failed to pursue it on the ground of lack of a "clear-cut remedy". The trial court said:

> "It must be admitted that the transactions amount to unorthodox banking. In fact, the bank in entering into such transactions without the knowledge or consent of the defendants skated on very thin ice and the matter has troubled the Court very greatly. But despite its misgivings and in the absence of a clearcut remedy the Court has held the transactions valid as between all parties to this action."

3 C.J.S. Agency § 139, elaborates further on the nature of duties imposed by this relationship:

> "An agent should not, without the knowledge of his principal, engage in transactions which tend to bring his personal interest into conflict with his obligations to his principal, nor should he place himself in a position where his interests may become antagonistic to those of his principal, or speculate in the subject matter of the agency. Also an agent should not, without a full disclosure of the fact to his principal, seek compensation from both parties * * *.

> "* * *

> "Although this rule is generally held adopted on the ground of public policy, courts have variously held the theory to be based on 'moral obligation', 'positive law', 'plain reason' and a desire to remove from the agent all temptation to neglect his principal's interest."

The particular circumstances and exigencies of this case are such that the principle of judicial discretion to grant equitable relief gives way to judicial duty to grant it. Equity follows the law in application of fiduciary duties. 3 Pomeroy's Equity Jurisprudence, 5th Ed., § 959, p. 819, states:

> "Principal and Agent--Generally. Equity regards and treats this relation in the same general manner, and with nearly the same strictness, as that of trustee

and beneficiary. The underlying thought is that an agent should not unite his personal and his representative characters in the same transaction; and equity will not permit him to be exposed to temptation or brought into a situation where his personal interests conflict with the interests of his principal and with the duties he owes to his principal." (Emphasis added).

In Middlefork Cattle Co. v. Todd, 49 Mont. 259, 262, 141 P. 641, this Court stated:

"Common honesty denies to an agent the right to profit at the expense of his principal by chicane and misrepresentation. If there are any instances wherein the law and justice are out of harmony, this is not one of them, for the courts are of one opinion in declaring that the unfaithful agent under such circumstances should be made to disgorge the amount of the profit so wrongfully realized."

Here, the Bank, in fact, made an actual cash outlay of $9,091.73 under the largest note. The total of the eight checks written by the Bank was $10,306.05, subtracting the $1,214.32 in rebates leaves $9,091.73. The remainder of $7,384.57 of the note is a renewal of a preexisting debt.

We are not here holding that an agent cannot deal separately if the facts are disclosed. We are holding that here, where the principal was charged $50 for expenses of setting the matter up, and where the agent was charging interest at ten percent on the money loaned, and the agent was secretly negotiating at the same time with creditors for other collection fees in the form of discounts or rebates, the failure to disclose is a breach of duty owing between the agent and his principal.

Therefore we hold as to the note for $17,690.62, Sant was entitled to a credit for the amount of $1,214.32, the rebates mentioned heretofore.

Sant at this point urges that under what he calls the "clean hands" doctrine, the acts of the Bank were fraudulent and therefore the entire transaction is void; thus Sant would be excused from the debt. We keep in mind here that the defense was based upon claims of usurious interest rates which were abandoned, and the pleadings were deemed amended to conform to the proof. The proof in our view is more in the way of accounting. It was not tried as a case on fraud.

However, since the mortgage was based upon the note and since, as will hereinafter appear, the other two notes were for moneys not due the Bank at all, the security of the mortgage fails. The underlying debts, however, do not.

The second issue pertains to the notes for $2,788.05 and $12,968.74 given by Sant to the Bank under the "Plan of Paris Robert". The sub-issues are: (a) Was there legal consideration to support these indenture contracts? (b) Was the Bank a real party in interest so as to have standing to sue for foreclosure on them?

From the record it appears no disbursement was made by the Bank to Sant, A. R. Smith or Russell Lepp under either note. Since the Bank paid no money under these two indenture contracts, Sant contends they are not based on any legal consideration. The Bank contends that under the statutes and precedent of Montana law a prior existing debt can be consideration for a subsequent new indenture instrument. The Bank's contention is correct and there does appear to have been a prior indebtedness of Sant in favor of A. R. Smith and Russell Lepp. However for this type of prior existing debt to be valid as consideration, it must be between the parties to the contract. The Bank cannot rely on prior existing debt to third parties as consideration for an indenture contract between it and Sant, unless in making the contract and suing on it, it is acting in some capacity of trusteeship, agency, or partnership for the two parties whose prior credit against Sant formed the consideration for the contract.

Sant contends the Bank was never acting in any capacity of joint venture, trusteeship, agency, or partnership for A.R. Smith or Russell Lepp in making these two indenture contracts or in suing for foreclosure on them. Looking back to the "Plan of Paris Robert", the caption thereon preceding the listing of the note for $2,788.05 and the note for $12,868.74 reads:

> "PAYING, with Notes, owned by: but as subdinated
> partners in collateral:"

The words "owned by" evidently refers to the Bank, since it is the sole payee and had continuous possession of the notes. The word "subdinated" is not to be found in the dictionary, possible the intended word was subordinated. "Subdinated" appears to be used as an adjective which modifies the noun "partners". This then would indicate that A. R. Smith, Russell Lepp and the Bank were in some kind of a partnership concerning these two notes. No such relationship is evidenced on the face of the notes, which show the Bank as sole payee. Nor does it appear from the testimony of Paris Robert or Russell Lepp that there was any express written or oral agreement between A. R. Smith and the Bank nor between Russell Lepp and the Bank creating a partnership, agency or trust. There are only the pencil notations in the margins of the notes and the explanation given of them by Robert. The binding effect of these notations is questionable at best. The burden of proof to establish the existence of a trust, partnership, joint venture, agency or any other such relationship is upon the party who claims it. Trusts must be founded on evidence which is unmistakable, clear, satisfactory and convincing. Bender v. Bender, 144 Mont. 470, 397 P.2d 957; Platts v. Platts, 134 Mont. 474, 334 P.2d 722.

In First State Bank v. Mussigbrod, 83 Mont. 68, 271 P. 695, cited by the Bank, this Court affirmed a foreclosure decree in a suit by one of three note owners, where all three notes were secured by one mortgage. There, however, the Court did find the existence of an express trust between the three note owners.

In the instant case the Bank is the owner of all the notes; A.R. Smith and Russell Lepp own no interest whatsoever. Presumably, the Bank would turn over the money realized in a foreclosure on these notes to the A. R. Smith Estate and to Russell Lepp. However, if the Bank chose to keep the money, Smith and Lepp not being parties to the notes and not having any express trust, partnership, agency, joint venture or other such relationship with the Bank, would have no recourse against the Bank. Since there was never

any release of the indebtedness given to Sant by either Smith or Lepp, their only recourse would be against Sant on the original debt. We find that it would be contrary to law and would ill serve the ends of justice and equity to allow foreclosure under these circumstances.

We hold therefore, regarding the note for $2,788.05 and the note for $12,968.74, that they were not supported by legal consideration between parties to them and that portion of the lien of the mortgage which secures them should be released. This holding does not affect any preexisting or present debt between Sant and Smith, or Sant and Lepp.

Summarizing the holding of the Court as it concerns all three notes between Sant and the Bank: Sant is entitled to credit in the amount of $1,214.32 on the note for $17,690.62. The Bank is not entitled to foreclose on the notes for $2,788.05 and $12,968.74.

The judgment of the district court is vacated and the cause is remanded to the district court for further proceedings consistent herewith.