**Darrell W. JELLY, a/k/a Bud Jelly, Appellant (Defendant below).**

v.

**Bill Arnold DABNEY, Appellee (Plaintiff below).**

No. 4835.

Supreme Court of Wyoming.

July 20, 1978.

Rex O. Arney, Redle, Yonkee & Arney, Sheridan, for appellant.

James N. Wolfe, Sheridan, for appellees.

Before GUTHRIE, C. J., and McCLINTOCK, RAPER, THOMAS and ROSE, JJ.

McCLINTOCK, Justice.

Darrell W. Jelly, hereinafter referred to as Jelly, the apparently successful participant in a barroom brawl in Sheridan County, Wyoming, appeals to this court from the judgment of the district court of that county awarding money damages to Bill Arnold Dabney, his defeated adversary in a barroom fracas, and denying Jelly's counterclaim for defamation. In asking dismissal of the claim against him, Jelly would have us ignore our long-standing rule permitting the trial court to be the arbiter of the facts and hold as a matter of law that the badly beaten Dabney was the aggressor. We elect not to do so, and will affirm the judgment, both as to the award of damages and as to the denial to Jelly of his slander claim.

On April 18, 1976 Jelly and his friend, Marilyn Howe, drove from Lodge Grass, Montana, to Sheridan, Wyoming. In the course of their return to Lodge Grass and between five and six o'clock in the evening they stopped at the Silver Spur Bar in Ranchester, Wyoming, to visit and socialize. They stayed at the tavern approximately one hour. Howe met and talked with friends, including one Enid Havener, who at the time of the trial was married to Bill. In the course of this conversation, as testified to by Mrs. Dabney, Howe was asked if "she had heard rumors about Bud and Linda having an affair." Bill Dabney, the plaintiff, was also there and entered into the conversation when Enid "told Marilyn to have it confirmed by Bill." This was done and Bill's reply was that "we had heard rumors to that effect, that they were having an affair. * * * He more or less confirmed it, and that's it." Howe became disturbed and at some time during the return trip to Lodge Grass questioned Jelly as to the truth of these allegations. He became upset and angry about this, going so far as to shove her face into the window. So far as the record shows, he did not deny the truth of the rumor.

After their return to Montana, Jelly first tried to contact Linda Dabney, as well as her husband, Jim (Bill's brother), but was unsuccessful and he and Howe returned to the bar in Ranchester where Bill was still sitting at the bar. This was about ten o'clock in the evening. Evidence concerning the altercation is conflicting, with Jelly testifying that as he approached Dabney the latter turned on his barstool, cocked his arm, got off his barstool, and started after Jelly swinging his fists, while the bartender on duty testified that Jelly hit Dabney before he was able to get off the barstool. He also stated that Dabney did not raise his hand in any gesture toward Jelly and that it was not until after Jelly had knocked Dabney against the wall that Dabney began to fall forward. At that point, he testified, the two of them got out into the middle of the dance floor. The only thing that he saw Dabney do was try to cover up. Jelly told a different story. Various other versions were given, and while they are interesting, in our opinion they add up to no more than a conflict of the evidence which by the judgment of the district judge has been resolved in favor of the plaintiff.

Jelly raises three issues on appeal:

1. That he was entitled to use reasonable force to defend himself from Dabney's attack, and therefore that the district court erred in awarding damages to Dabney;

2. That Dabney assumed the risk of harm that arose from Jelly's conduct, and therefore Dabney cannot recover damages and the district court was in error when awarding them; and

3. That Dabney defamed Jelly when he made the statement in question, and that such a statement was actionable per se, and, therefore, the district court was in error in not awarding Jelly damages.

These issues will be addressed as set forth, although we note that the thrust of this appeal is directed toward questions of fact that must be considered together in order that a clear view of the case be obtained.

■■■ Although we have stated the rule on appeal numerous times, we again an-nounce that we must assume that the evidence in favor of the successful party is true, leaving out of consideration entirely the evidence of the unsuccessful party that conflicts with it, and giving to the evidence of the successful party every favorable inference which may reasonably and fairly be drawn from it. *Laramie Rivers Company v. Pioneer Canal Co.,* Wyo., 565 P.2d 1241 (1977); *Kahler v. Martin,* Wyo., 570 P.2d 720 (1977). We will not reverse a judgment of a trial court if the only alleged error relates to a finding based upon evidence in which there is a substantial conflict. *Scott v. Elwood,* 77 Wyo. 428, 317 P.2d 513 (1957). It should also be noted that here we are faced with a situation where the issues were tried to the court, without a jury, and that court found generally for the plaintiff Dabney and against the defendant Jelly. In like situations the rule is that a general finding is treated as a special finding as to all necessary elements required to sustain the judgment, that these facts so established will be presumed to be established in favor of the party prevailing, and against the party against whom the court finds. This has been the rule in Wyoming since the issue was first presented. *Wallis v. Nauman,* 61 Wyo. 231, 157 P.2d 285 (1945); *True v. Hi-Plains Elevator Machinery, Inc.,* Wyo., 577 P.2d 991 (1978). Judged by these standards and measured against these rules, the appeal of Jelly with respect to the assault must fail.

■■■ The trial court found Jelly the aggressor; we must accept that fact as proven. It is clear that under law the aggressor is not entitled to exercise his privilege of self-defense unless and until he attempts withdrawal from the conflict. *Penn v. Henderson,* 174 Or. 1, 146 P.2d 760 (1944); *Delaney v. State,* 14 Wyo. 1, 81 P. 792 (1905); Restatement of Torts, § 63 comment k; Prosser, Torts (4th ed. 1971), § 19. It is true that the *Delaney* case is criminal in nature, but the law is the same. We have no evidence here that Jelly attempted to remove himself from the fight. If Jelly was the aggressor then Dabney was cloaked with the privilege of self-defense; the con-

tention of Jelly that Dabney assumed the risk of the consequences of the battle is nonsense. One cannot logically raise as a bar to recovery assumption of the risk when another acts in self-defense. We must assume Dabney, not the aggressor, so acted. The conduct of Jelly remained a legal wrong to Dabney notwithstanding the latter's exercise of his privilege. Dabney cannot be held to have voluntarily chosen or have consented to this battery.

There is little to add to the above brief statement concerning the alleged slander. The subject of an "affair" between Jelly and Linda Dabney (wife of Bill's brother Jim) appears to have been opened by Enid Havener Dabney and Bill confirmed that he had heard rumors to that effect. Ms. Howe testified to the effect that "they" (presumably referring to Enid and Bill) just knew. No attempt was made upon the trial to establish just what the meaning or innuendo of the word "affair" was, nor did Jelly attempt to show any special damage that occurred to him as a result of the alleged slur, such as loss of reputation, position or standing in the community. He now contends that the plain, ordinary meaning of "having an affair" is that one is having an illicit sexual relationship with another person, which when said about a woman subjects the utterer to liability without proof of special harm or the extent of the damage suffered.

■ However, he also recognizes that this rule does not apply to men "unless it refers to the man having committed a criminal offense."

The concession appears to us to be well taken. Prosser in his text on the Law of Torts, 4th Ed., § 112, after pointing out that the old law that an imputation of chastity as to either sex was regarded only as a "spiritual matter," goes on to state on p. 760 of the text:

"  *  *  *  Most courts, however, have now rebelled at the reproach to the law involved in such a result, and have held that an oral imputation of unchastity to a woman is actionable without proof of damage without regard to whether it

charges a crime. Such a rule never has been applied to a man, since the damage to his reputation is assumed not to be as great." (Cited cases omitted)

See also Annotation in 55 A.L.R. 175, "Oral imputation of sexual immorality to man as actionable per se."

Counsel quotes from § 6–86, W.S.1957 (now repealed in its entirety), which provides that

"Whoever *cohabits* with another in a state of adultery or fornication or adultery and fornication, shall be fined in a sum not exceeding one hundred dollars, and be imprisoned in the county jail not exceeding three months." (Emphasis added)

■ Judgment of the trial court is brief, finding generally in favor of the plaintiff and against the defendant on the latter's counterclaim. However, in view of the uncontradicted evidence concerning the utterance we could not conclude that it found that there had been no such remark but only that as a matter of law the statement did not amount to slander per se and that without proof of special harm there was no sufficient claim established against the plaintiff. We agree with this conclusion and are of the opinion that the key word in the criminal statute cited is "cohabit." Under this law, Jelly could not be guilty of a crime of adultery unless within the definitions of the statute he had cohabited with Linda. This construction is found in *Kennedy v. State*, Wyo., 470 P.2d 372, 375 (1970), reh. den. Without giving a definition of the term, but in rejecting the argument that in a prosecution for rape the jury should have been permitted to consider adultery as an included offense, we said, "[t]here was no evidence of a cohabitation in this case." Since the statutory offense is committed as to either adultery or fornication only by one who "cohabits with another" in either or both states, we have no hesitation in concluding that cohabitation is a necessary element of the criminal act set forth in § 6–86. Our statute may well differ in this respect from statutes in other states and from definitions of the term by

other courts, but we are bound by the definition of the crime given by our legislature.

The key word in the statute pertinent to this case is then the word "cohabit." The rule is stated in 74 A.L.R. 1363:

"To constitute the offense of illicit cohabitation, there must be a dwelling or living together by a man and woman, not legally married to each other, in the manner of husband and wife, and indulgence in acts of sexual intercourse. Whether an association for the purpose of illicit intercourse has been such as to constitute an unlawful assumption of the conjugal relation is a question of fact. It is well settled, however, that proof of a single or mere occasional act of illicit intercourse is not sufficient to establish the offense."

Under other authorities it seems to be well established that the word " 'cohabit' means living together as man and wife." *Matter of Marriage of Walter,* 27 Or.App. 721, 557 P.2d 57 (1976). See also, 7A Words and Phrases, p. 116 et seq. While many of the cases so defining the term are civil cases, we find the same definition in criminal cases. We think we need go no further than a citation from our sister state of Indiana which in an 1884 decision construed the same provision, adopted by Ch. 73, S.L. of Wyoming 1890, for as we said in *Woodward v. Haney,* Wyo., 564 P.2d 844, 845 (1977):

"It is not unreasonable to hold that a statute taken from another state is adopted with the construction placed upon it by the highest court of the parent jurisdiction. [Citations omitted] * * * Where a statute that has been construed by the courts of last resort of another state has been enacted in the same terms by the Wyoming Legislature, the Legislature is presumed to have adopted it as a part of the law and intended the same construction apply in this state."

In *State v. Chandler,* 96 Ind. 591, 592–593 (1884) it was said:

"The term *cohabit* has not such a broad and certain meaning as that annexed to it by the State. The word is not one of a certain meaning, for the lexicographers define it to mean 'to dwell with another in the same place;' 'to live together as husband and wife.' Worcester's Dict.; Webster's Dict. Bouvier says: 'The word does not include, in its signification, necessarily, the occupying the same bed * * *.' The word, considered apart from the words with which it is associated, can not, then, be taken as equivalent to the language of the statute, for it can not be inferred from the use of the word that the parties were guilty of adultery or fornication. The statute itself employs the word in the sense of living together, but does not annex to it the signification claimed."

■ It should be noted that as to an indictment that the accused parties did "live and cohabit together as man and wife," these words were held equivalent in meaning to "that conveyed by the words 'in a state of fornication.' " There is no allegation or proof that either Enid or Bill charged Jelly and Linda with living together either as man and wife or as living in a state of fornication. It follows, therefore, that the alleged statement in no way involved the imputation of a crime to Jelly and it can therefore not be said to have constituted slander per se.

The judgment of the trial court is affirmed, with costs to be assessed against the appellant.

GUTHRIE, Chief Justice, specially concurring.

I concur in the result herein, but only reluctantly join in the holding that there was reasonable cause for this appeal.