Louis S. MADRID, Appellant
(Plaintiff below),

v.

Edgar F. NORTON, Appellee
(Defendant below).

Edgar F. NORTON, Appellant
(Defendant below),

v.

Louis S. MADRID, Appellee
(Plaintiff below).

Nos. 5041, 5042.

Supreme Court of Wyoming.

June 25, 1979.

William H. Brown (argued), and Claude W. Martin, Casper, for appellant.

Houston G. Williams (argued), Casper, for appellee.

Before RAPER, C. J., and McCLINTOCK, THOMAS, ROSE and ROONEY, JJ.

RAPER, Chief Justice.

As the result of the dissolution of a joint venture or joint ventures, the district court awarded the appellant (cross-appellee) plaintiff Louis S. Madrid (hereinafter plaintiff) a judgment against appellee (cross-appellant) defendant Edgar F. Norton (hereinafter defendant) a judgment upon a claim for an accounting a total amount of $6,050.25.[1] The plaintiff in this appeal claims that sum to be inadequate and asserts errors by the trial court in that it:

1. Failed to demand that Norton live up to the obligations of his fiduciary relationship.

2. Failed to recognize that the information assembled by Madrid and Norton had substantial value.

3. Held that confidential information is one of the elements of a fiduciary relation.

4. Held that the legal relationship between Madrid and Norton consisted of a series of joint ventures.

---

1. The judgment in pertinent part:

"IT IS ORDERED, ADJUDGED, AND DECREED that Plaintiff take nothing by his Complaint herein filed, insofar as he claims an interest in the oil and gas leases described in Plaintiff's Complaint, and that judgment in favor of Defendant and against Plaintiff upon such demand in Plaintiff's Complaint be and is hereby entered.

"IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that upon Plaintiff's claim for money accounting, that Plaintiff have and recover judgment against the Defendant in the sum of $2,016.75 for the Fifield draft and $4,033.50 for the Jenkins draft, and that such accounting is complete and final."

5. Held that the agreement between Madrid and Norton was so vague as to its terms as to be unenforceable.

6. Found that Madrid and Norton agreed to share only the Reeder, Boner, and Waring leases after they terminated their joint venture.

The defendant contends the true issues to be:

1. Was there sufficient evidence to support the trial court's finding of fact that Madrid and Norton terminated their relationship on or about January 15, 1975, agreeing that there were three specific leases in which they would share an equal interest, and agreeing further that each was to be free to obtain leases for his own account?

2. Was the trial court correct in its conclusion of law that once the relationship between Madrid and Norton had terminated, Norton was free to lease for his own account and was entitled to retain the leases he did obtain for his own account?

3. Is there sufficient evidence to support the trial court's finding of fact and attendant conclusion of law that the relationship between Madrid and Norton was a series of joint ventures which ended on or about January 15, 1975, by mutual agreement and that there was no agreement between Madrid and Norton to commence a fourth joint venture?

4. Was the trial court correct in concluding from the evidence that the alleged agreement to continue a joint venture between the parties was so vague as to be unenforceable in any event?

(i) Notwithstanding such conclusion on the part of the trial court, was the trial court nevertheless correct in its ultimate decision on other grounds?

5. Was there sufficient evidence to support the trial court's findings and conclusions that, upon termination of the relationship between Madrid and Norton on or about January 15, 1975, any previous fiduciary relationship between them did not continue beyond the termination date with respect to the leases involved in this case?

In his cross appeal the defendant admits that he owes plaintiff $2,016.75 on the "Fifield" bonus payment but claims the trial judge erroneously found $4,033.50 due plaintiff on the "Jenkins" bonus payment and, in addition, urges there should have been a credit of $721.20 owing out of the "Diamond Shamrock" lease, on any amounts found due by defendant to plaintiff.

We will affirm.

While in this particular case it adds to the length of the opinion, the findings of fact of the trial judge separately stated and numbered will be used as the factual narrative since parts of them are critical to a disposition of the case and because they accurately reflect the record of testimony and exhibits. We include them also because they serve as an illustration to the bench and bar of what we consider to be professionally and competently prepared findings of fact. In a complex case, such well-formulated findings aid this court in disposing of the appeal and in understanding the precise questions presented to the trial court and why they were decided as they were. While we must verify the findings against the 474 pages of transcript and 60 some exhibits, defendant's counsel eased that task by annotating in his brief each finding of fact to the record.

"1. Plaintiff, Madrid, and Defendant, Norton, are both experienced oil and gas landmen and lease brokers. Their association commenced in January 1974 when Madrid had a 'ticket' (authority to acquire oil and gas leases for the account, and at the expense, of another) from one Haynie, an independent oil and gas lease broker, in Sheridan County, Wyoming.

"2. Madrid used Norton and another landman to do the work of checking county records and obtaining of oil and gas leases from private mineral owners in Sheridan County. The job was completed within the boundaries established by Haynie. During his work in Sheridan County on this project, Norton obtained information that there were other lands near the project which

were unleased for oil and gas, and he believed that leases could be acquired on such lands for reasonable prices (bonuses) and reasonable delay rentals.

"3. Madrid and Norton discussed the matter and agreed that they would, for their joint account, attempt to obtain oil and gas leases on approximately 15,000 acres. Madrid agreed to obtain approximately $75,000 to pay for the leases; and at the price per acre they believed they would have to pay, the acreage acquisition was necessarily limited to about 15,000 acres. They agreed that Norton would check the records and negotiate the leases and send drafts on Madrid's bank to pay the bonuses; Madrid would arrange the approximate $75,000 to do this, and Madrid would engage in trying to sell the block to someone. They agreed to divide whatever profits were realized equally, both as to money and reserved overriding royalties. This was the extent of their agreement at that time.

"4. Norton obtained the block of acreage as agreed, and sent drafts to Madrid for payment. The drafts were thirty-day drafts and, prior to the due dates, Madrid made an agreement with one Marty Friedman to pay the drafts when due. The agreement was that Friedman, upon a sale of the block, would be repaid moneys he advanced, and the three parties would then share equally in any profits made on the sale. The first block of leases was sold to Diamond Shamrock, and the agreement performed. Madrid and Norton had no more leases, having sold the entire first block to Diamond Shamrock. After the first block, Friedman no longer participated with Madrid and Norton in subsequent activities.

"5. While negotiating for a sale of the first block, an offer was made to sell to Michigan-Wisconsin Pipeline Company. However, that company would not agree to the amount of overriding royalty Madrid and Norton proposed to reserve, to-wit, 6¼ percent. Madrid and Norton believed, from Michigan-Wisconsin's expressed interest in the area, that if they could put together a second block of Sheridan County acreage, they might well sell it to said company and make a profit. They discussed the matter and agreed to embark upon a second venture. They agreed to limit the amount of acreage to be obtained, as previously, and upon the area in which the leasing was to be attempted.

"6. Norton, doing the field work, again obtained a second block of Sheridan County acreage. Madrid again had agreed to arrange for the money and to negotiate the sale. The money from the sale of the first block was put in Madrid's own bank account and disbursements were later made from it by Madrid.

"7. The second block of Sheridan County acreage was sold to Michigan-Wisconsin Pipeline Company almost immediately. Again, the money was placed in Madrid's account.

"8. Having successfully obtained two blocks of acreage, and again having sold the entire inventory of leases, Madrid and Norton decided to attempt to put together a third block of Sheridan County acreage— again limited in acreage and again in an agreed area of the county. Norton obtained leases constituting a third block, as agreed. However, this time Madrid was not successful in making a fast sale of the third block, although many companies were solicited by him.

"9. Madrid and Norton now had a third inventory of acreage and a substantial investment in acquisition costs, which acreage was not readily saleable. They discussed steps to be taken to make their third package more attractive to prospective buyers. They agreed that they should attempt to go into Converse County, pay more for some better leases, and put the Converse County leases into the third block with the Sheridan County leases and offer such block for sale. They examined the Converse County public records and used RIMCO and POMCO maps to determine which leases were expiring. These maps may be purchased by anyone for a price, and they show mineral ownership and lease information on them.

"10. In selecting the area in Converse County within which to attempt leasing,

Madrid and Norton tried to select lands in the vicinity of an 'axis' which was well known to oil people and was delineated by public geological records, particularly the United States Geological Survey records. In none of their dealing did either Madrid or Norton ever have access to or knowledge of technical, geological or engineering data, and no particular suspected pool of oil or gas was known to them except as may have been of general knowledge in the oil business. Also, Madrid and Norton never drew up any map, nor made any agreement upon, nor delineated a specific area in which to concentrate their efforts. They simply tried, in Converse County at least, to secure acreage near known areas of production or interest.

"11. Madrid and Norton did acquire leases in Converse County, paying more for them than for the Sheridan County acreage. They packaged the leases in the two counties together and this time were successful in selling the third block to Diamond Shamrock on October 29, 1974. Norton continued doing some title work on this block of leases in Converse County during November and December 1974 and the fore part of January 1975. They were once again out of leases.

"12. No further agreement was made by Madrid and Norton to commence leasing a fourth block. There followed a period of relative inactivity on the part of Madrid and Norton. They decided to send out inquiries to some additional prospective lessors, with a price much below that paid for the Converse County leases they did obtain. This was entirely unsuccessful, and no follow-up was attempted then by either party.

"13. Madrid and Norton had, during the leasing activities, made contact with lessors with respect to three prospective leases, known by them as the Waring lease, the Boner-Schlichting lease, and the Reeder lease. They had not obtained such leases at the time of the sale of the third block and did not include them in the package sold to Diamond Shamrock in October 1974.

"14. Personal relations between Madrid and Norton, and between their employees,

started to deteriorate following the final sale. Norton was complaining about Madrid's handling of the money, and Madrid objected to Norton's secretary coming to his office and going through files. Consequently, Norton asked for a meeting in Denver with Madrid and this took place on or about January 15, 1975. They discussed briefly the difficulties which had arisen, and both agreed to terminate any association together. They had at one time discussed becoming partners, but agreed not to do so, each having done work for himself with no participation by the other during the period in question.

"15. At the January 1975 meeting, and after having agreed to terminate their association, Madrid and Norton specifically discussed what was to be done about the Waring, Boner-Schlichting and Reeder leases. They agreed that they were close to obtaining these leases and that they would go ahead and obtain them if they could, sell them, and divide the profits equally. They did not discuss any other leases. They agreed that from that date forward, except for the three named leases, they would 'each do his own thing'; that is, each would be free to pursue leases for his own account and at his own risk.

"16. Norton later did obtain the Waring lease, which was a valuable lease being in the area of the Spearhead Ranch discovery. He assigned a one-half interest to Madrid and they sold the lease and divided the profits, including overriding royalty, equally. Madrid obtained the Boner-Schlichting and Reeder leases. He tendered to Norton a one-half interest by letter dated March 19, 1975, without advising Norton of the bonus paid or any of the terms in the Boner-Schlichting lease. Just prior to the filing by Madrid of this action and by letter of March 1, 1976, Madrid tendered to Norton a one-half interest in the Reeder lease which he had acquired almost a year prevoiusly. [sic]. This action was filed on March 4, 1976, by Madrid against Norton. Both letters placed a deadline for acceptance by Norton. When he received these letters, Norton did not respond as he wanted no more to do with Madrid.

"17. Following the January 1975 meeting in Denver, both Madrid and Norton were interested in acquiring leases in Converse County, each for his own account. Norton immediately went to Converse County himself for this purpose. Madrid waited a period of time and then sent a landman, hired by him, into Converse County to obtain leases for Madrid. Madrid also instructed the landman to observe what Norton was doing. Madrid's attempt was highly unsuccessful and in fact he and the landman fell out because Madrid found out that the landman had taken a lease for himself which Madrid wanted and felt it should have been taken for Madrid.

"18. On the other hand, Norton was successful in acquiring several oil and gas leases for himself. These are described in Exhibit 'A' to Madrid's Complaint. From January 15, 1975, Madrid never made any demand on Norton for any interest in any of these leases, nor was there any discussion of them between Madrid and Norton until production was obtained, in November 1975, on one of them, the so-called 'Sullivan' lease. Madrid knew in March 1975 that Norton had taken the Sullivan lease. In Madrid's letter of March 1, 1976, which he sent to Norton after conferring with Mr. Martin, one of his attorneys in Casper, he made, for the first time, some reference to other leases by saying, 'I would appreciate your reviewing your files to determine if the same possibility exists relative to any leases which you might have acquired and that a reciprocal arrangement would be in order by virtue of the original agreement which existed between us.' At the time of this March 1, 1976 letter, Madrid knew that there was production on the Sullivan lease and that Norton had obtained it and the other leases described upon Exhibit 'A' to his Complaint filed three days later.

"19. Madrid made no real effort to keep in contact with Norton after January 15, 1975. They met in Denver for the purpose of settling their joint account of moneys owed, but there was no discussion with respect to any leases taken by either party in his own name. The accounting will be separately discussed hereinafter.

"20. With respect to Norton's acquisition of the Sullivan lease, Norton had checked the county records and had observed that an existing lease had a termination date upcoming when he was in Converse County in October of 1974. This lease was one of many that he and Madrid had discovered from their examinations. Norton wrote to Joseph Sullivan, as attorney, at Douglas, Wyoming, on October 14, 1974, after having been referred to Sullivan by The Wyoming National Bank of Casper, the depository bank named on the expiring recorded lease. Mr. Sullivan answered by letter on October 15, 1974, and advised him of the death of Cecilia Macken, the lessor named in the expiring lease. Norton had offered to lease a part of the Macken land, not all of it, in a letter of October 18, 1975, for $25 per acre bonus, *which was the reduced price he and Madrid had agreed to offer.* They had been required to pay more than twice such amount for the Converse County leases they did acquire.

"21. Norton was refused by Sullivan and advised that the Macken Will had devised the mineral interests of the decedent 40 percent to Sullivan's wife Margaret, 40 percent to Rev. Terence McGovern, and 20 percent to Rev. Colm Woods. Sullivan and his wife, Margaret, on behalf of all devisees, refused to deal on a new lease until the Macken Estate was closed. Nothing further occurred with respect to the Sullivan lease until after January 15, 1975, when Madrid and Norton terminated their association.

"22. On January 29, 1975, with some competition from Woods Petroleum Company, the prior lessee, Norton negotiated a lease from the mineral owners, Margaret Sullivan, Rev. McGovern and Rev. Woods. The original October 1974 offer by Norton included only the E $\frac{1}{2}$ of Section 23, Township 40 North, Range 74 West. His lease card shows that he knew of a dry hole in the SE ¼ of Section 30, same Township and Range, drilled to 12,951 feet, and the card shows that while Norton knew that the expiring Macken lease covered not only the

E ½ of Section 23, but also the SE ¼ of Section 30 and the NE ¼ of Section 31, he entered a note thereon to 'disregard Secs. 30 & 31.' When Norton negotiated the Sullivan lease, he was required by the lessors to include all of the acreage, and not just the E ½ of Section 23. He also had to pay a bonus of $55 per acre, and to increase the landowner's royalty to 14 percent from the commonly offered 12½ percent. Norton did not consider the Sullivan lease as being as valuable as the Waring lease, which he and Madrid shared under their January 1975 termination agreement.

"23. While not productive, the other leases obtained by Norton after January 15, 1975, were also included in Madrid's suit against Norton. Two leases covering the S ½ of Section 1, Township 36 North, Range 73 West, from Paul Grosch and wife and Herman Hersch and wife to Norton, suffered a failure of title by reason of prior recordation of a conflicting lease. The Harless and Tonkinson leases in the SE ¼ of Section 2, NE ¼ of Section 11, Township 39 North, Range 74 West, were secured by Norton after January 15, 1975, on new terms made by Norton. Also, the Bolley and Phillips lease covering Lots 3 and 4, S ½ NW ¼, SW ¼ of Section 5, Township 39 North, Range 74 West, were dated after January 15, 1975, and were paid for in March 1975 by Norton. The Ulrich lease on the SW ¼ NW ¼ of Section 26, E ½ NE ¼ of Section 27, Township 39 North, Range 76 West, was dated January 31, 1975, and was paid for by Norton in March 1975. The Savage lease covering NW ¼ NE ¼ of Section 21, Township 36 North, Range 69 West, was originally negotiated for by Norton in November and December of 1974. This lease was ultimately obtained January 27, 1975, for a bonus more than previously offered and for an excess landowner's royalty. All of these leases are in three different townships from the Sullivan lease.

"24. Madrid and Norton met in Denver on an accounting for moneys between them, sometime after their January 15, 1975 termination meeting. Each brought to the meeting a typed sheet containing figures. An agreed sum was then arrived at and

Exhibit 'B' in evidence shows some hand-written entries on Madrid's typewritten sheet. The agreed figure was $22,663.83, and this amount was owed Norton by Madrid. Madrid wrote Norton a check in the amount of $22,663.83 (Exhibit 72) containing the notation 'Final Payment.' Also written on the check were certain lease numbers of leases for which Madrid had not received payment by Diamond Shamrock on the sale of the third and final block.

"25. Norton admitted on the record that he is obligated to pay Madrid $2,016.75 which Norton is holding for Madrid from the Fifield draft.

"26. Norton is obligated to pay Madrid $4,033.50 in repayment of a check written on Madrid's personal account for the purpose of acquiring the Jenkins lease. This amount was not accounted for in the detailed accounting between Madrid and Norton in late November 1975.

"27. The so-called Rohres drilling venture in which Madrid and Norton participated was a separate, isolated transaction, in no way connected with the transactions recited hereinabove and it has no bearing thereon."

What the trial judge did is best explained by setting out his commendably comprehensive conclusions of law distilled from the foregoing statement of facts. As will be seen, the conclusions do include a combination of ultimate facts as well as conclusions of law and their painstaking analyses are useful to us in that respect. After noting the jurisdiction of the court in paragraph "1", they go on to conclude that:

" * * *

"2. Based upon the foregoing Findings of Fact, the Court concludes that the legal relationships between Madrid and Norton consisted of a series of joint ventures. *Wyoming Indiana Oil & Gas Co. v. Weston, et al.*, [43 Wyo. 526], 7 P.2d 206 (Wyo.1932); *Hoge v. George*, [27 Wyo. 423], 200 P. 96 (Wyo.1921); and *Reece v. Rhoades*, [25 Wyo. 91], 165 P. 449 (Wyo.1917). The first involved the acquisition of a block of oil and gas leases in Sheridan County, Wyoming,

which the parties agreed would be approximately 15,000 acres and agreed upon the general area of leasing. The first ended upon the sale of the entire block to Diamond Shamrock. This venture also involved a third joint venturer, Friedman. Upon the completion of such venture, Friedman was no longer associated with the parties in subsequent joint ventures. (Bracketed material added.)

"The second joint venture was agreed upon in advance by the parties. It consisted of the acquisition of a second block of leases in Sheridan County, again in a block of approximately 15,000 to 20,000 acres and in a disignated [sic] area, to be sold as soon as possible after being obtained. This venture ended when all the leases in the second block were sold to Michigan-Wisconsin Pipeline Company. The parties had no more leases after such sale.

"The third joint venture was again agreed upon in advance as to locale and size—again to be acquired for resale. When not readily saleable, the parties agreed to acquire some additional leases in Converse County and when done, the third block was sold to Diamond Shamrock, leaving the parties again without any leases.

"The purposes of the three joint ventures were accomplished as agreed upon by the parties.

"3. There was no agreement between the parties to commence a fourth joint venture, as was done prior to commencement of the three prior ventures. The parties again had sold all the leases they had acquired in the third venture and it was completed, except for some title curative work which was later done.

"4. The parties did agree to attempt the acquisition of some additional leases in Converse County by sending letters to prosepctive [sic] lessors, at a price which was half or less than half of the price they had paid for the Converse County leases put in the third block, but were not successful in obtaining any leases in this fashion.

"5. On or about January 15, 1975, after a period of relative inactivity, the parties met and agreed to, and did, terminate any further association. They had previously discussed becoming partners, rather than joint venturers, but neither party agreed to a partnership arrangement.

"6. As of the termination date, the parties were close to acquiring three additional leases, the Waring, Boner-Schlichting, and Reeder. They specifically agreed to go ahead jointly to acquire these leases. This was done, and Norton assigned to Madrid a one-half interest in the Waring. Madrid acquired the Boner-Schlichting and Reeder leases. He tendered an interest in the first to Norton fairly promptly, but held the second for almost a year before he tendered to Norton an interest in the second. Significantly, the latter tender was made only three days prior to Madrid's filing of this action to recover interests in other leases taken by Norton after January 15, 1975, and after Madrid had conferred with one of his attorneys.

"7. Upon termination, on January 15, 1975, of the association between Madrid and Norton, whether they were still joint venturers or not, each was free to pursue leasing activities for his own account. The Supreme Court of Kansas, in an oil and gas case, stated the rule to be (citing 46 Am. Jur.2d, Joint Ventures, § 54, pp. 74, 75):

'Obviously there can be no recovery by one coventurer for property acquired by another after the joint venture has been completely terminated . . . Clearly, where a joint venture has been formed for the acquisition, ownership, or development of certain defined property, the fiduciary relationship does not forbid the acquisition, ownership, or development by one of the parties for his own benefit of property not embraced in the enterprise and outside its scope.' *Foley et a. [sic], v. Phillips, et al.*, 508 P.2d 975, [979–980] (Kan.1973) (Bracketed material added.)

"8. The evidence taken as a whole has failed to establish Madrid's contention that the joint venture encompassed the Powder River Basin as the area of interest, but even if established, it terminated on or about January 15, 1975. Plaintiff has failed

to sustain the burden of proof that the joint venture continued after said date as to any but the three named leases which the parties specifically agreed would be subject to a division of interest between them. Plaintiff testified that he mentioned the fact that there might be other leases the parties should talk about. Defendant denied such conversation. Be that as it may, it was admitted by Plaintiff that no further discussion did take place, and he made little or no attempt to assert any interest in any lease, other than the three mentioned, from January 15, 1975, until March 1, 1976, at which time he made a rather general reference to other leases in a letter to Defendant. He did this three days before he brought suit. He had known of Norton's leasing activities for some time, and had known since March 1975 that Norton had obtained the Sullivan lease. Yet Madrid made no claim or demand whatever as to an interest in any lease acquired by Norton until this suit was brought.

"It is most significant that Madrid's demands arose after it was known that the Sullivan lease had become productive. Up until this occurred, he evidenced no particular interest in Norton's activities.

"9. As to Madrid's contention that the joint venture continued, at best Plaintiff is asking the Court to enforce an alleged agreement that is so vague as to terms as to be unenforceable. In those instances where courts have enforced joint venture agreements, as to oil and gas leasing activities, the Plaintiff established a specific area of interest, the length of term of agreement, and the various items agreed upon. The courts, however, will not make a contract for the parties which they, themselves, have not made. *Phillips v. Hamilton*, [17 Wyo. 41,] 95 P. 846 (Wyo.1908).

"Here, then, was no map or legal description delineating the alleged area of interest; no time limit was spoken of; no agreement was established as to prices to be paid for leases; no agreement was made respecting a prospective sale of any acreage; nor were any items of agreement established which would continue a joint venture between the parties.

"Contrariwise, both parties admit that they intended to terminate their relationship, whatever it was at that point, and to go their separate ways (retaining only the three named leases or prospects for acquisition). Without having agreed specifically upon other leasing prospects; without having agreed upon an area; without having agreed upon prices and other terms of leases; without any agreement for financing any further leases or blocks; and with no further conferences having taken place except to wind up the money accounting, there is no agreement to enforce. It should be observed that the parties, on the three previous joint ventures, had no difficulty in conferring and arriving at agreement on all these matters prior to commencement of work. Once they agreed to termination, the actions, or inactions, of both parties subsequent to termination are entirely consistent with there having been no further agreement with respect to the leases described in Plaintiff's complaint.

"10. Madrid contends that a fiduciary relationship nevertheless survived termination because Norton obtained certain information while associated with Madrid in the three ventures, which Norton later used to his advantage at a later date. Unlike other cases where courts have extended the fiduciary relationship as a matter of law, here there was no confidential information obtained. There was no specific geological information known to either Madrid or Norton. The information they had was obtainable by anyone from the public records, or from maps which were on sale to any member of the public. When they agreed to part company, they both had information obtained within the time frame of their association.

"They agreed each was to be free to pursue leasing activities on his own. At that point in time, only three leases were close to being obtained. They had no other leases in this category. It is a fact that Norton immediately went to work and later pursued some leases successfully. Madrid chose not to do so, but later sent a landman

in his employ to try to obtain other leases. This was apparently a bad choice, as a dispute arose as to whether the landman took a lease for himself which Madrid wanted. In any event, Norton should not be penalized just because he promptly went to work.

"For the foregoing reasons, the Court holds that the fiduciary relationship created between the parties with respect to those joint ventures successfully completed did not go beyond those ventures, but existed only within them since all were defined and agreed upon and since the relationship between the parties was terminated by joint agreement.

"11. As to Madrid's assertion of a right to an equal share with Norton in the oil and gas leases described in Plaintiff's Complaint, the Court holds that Plaintiff has failed to sustain the burden of proof, and upon all the evidence and the law, the Court finds generally in favor of Defendant, Norton, and against Plaintiff, Madrid, and judgment will be entered accordingly.

"12. Norton admitted owing Madrid $2,016.75, being one-half of the return bonus offered by him for the 'Fifield' lease, which did not mature into a firm lease, which Norton must pay Madrid.

"13. Norton must pay Madrid $4,033.50, which amount was paid by a check issued on Madrid's personal account for the purpose of acquiring the Jenkins lease.

"14. Defendant has withdrawn his Counterclaim in this case.

"15. Judgment shall be ordered in conformity with these Findings of Fact and Conclusions of Law, and with the entry of such judgment, all accounting between the parties will have been made and be final."

▋ This case is dependent upon the view we take of the facts found by the district judge. There are settled appellate concepts which we follow, all for the most part favorable to the party prevailing in the trial court. An appealing party has a heavy burden to overcome. We must assume that the evidence in favor of the successful party is true, leave out of consideration entirely the evidence of the unsuccessful party that conflicts with it and give the evidence of the successful party every favorable inference which may reasonably and fairly be drawn from it. *Jelly v. Dabney*, Wyo.1978, 581 P.2d 622, 624; *Laramie Rivers Co. v. Pioneer Canal Co.*, Wyo.1977, 565 P.2d 1241, 1243–44; West's Wyoming Digest, Appeal & Error ▋ In this case, there were special findings of fact which must be construed liberally and favorably to the judgment. We presume that they are right and where the findings of the trial court are not inconsistent with the evidence, clearly erroneous, or contrary to the great weight of the evidence, they will not be disturbed on appeal. *Diamond Management Corp. v. Empire Gas Corp.*, 594 P.2d 964 (1979); *LeBar v. Haynie*, Wyo.1976, 552 P.2d 1107, 1110. Moreover, the trial judge was present and observed at first hand the demeanor and expressions of the witnesses. We must not forget that when we examine the cold words of the transcript of testimony, we do not have the benefit of how the trial judge sees and hears the witness—the pitch of the voice, facial changes, the movement in the witness—all of which may tell a separate story, to be given credence. The conclusion of what preponderates is with the trier of fact. *Koch v. Brown*, Wyo.1965, 401 P.2d 459.[2] Credibility of witnesses is for the trial court. *Hench v. Robinson*, 1955, 75 Wyo. 1, 291 P.2d 417; *Eblen v. Eblen*, 1951, 68 Wyo. 353, 234 P.2d 434. Appellate courts cannot try a case de novo. *Marken v. Goodall*, 10th Cir. 1973, 478 F.2d 1052.

---

2. As said in *Bogle v. Paulson*, 1949, 185 Or. 211, 201 P.2d 733:

"* * * Many times the countenance of the witness and the tale it tells are a more reliable index to the truth than the witness's tongue. The tongue is subject to the witness's studied volition, but his manner, his gestures, his passions and the tone of his voice may be unwitting. A meditated, carefully thought-out answer, even though it dovetails perfectly with the rest of the witness's testimony, may be less convincing than testimony given readily and without delay by another whose answers do not always accord."

There were only four witnesses: the plaintiff, the defendant, Father Terence McGovern and Margaret Sullivan (by deposition only). The latter two witnesses only testified as to the execution of the Sullivan-McGovern-Woods lease to the defendant and the fact that substantial royalty payments were being received, as the result of a producing well.[3] The plaintiff and defendant were pitted against each other with respect to an oral agreement terminating their last joint venture. There were no memoranda that could be pieced together into a written agreement. There were no witnesses to their discussions on January 13, 1975—(that date according to the defendant; January 15, 1975, according to the plaintiff). The trial was held over three years later, when memories must have somewhat dimmed. This combination can only present a formidable task for a trial judge. We agree that the most pertinent issues are those outlined by the defendant. In the absence of a written joint venture agreement, this case became one entirely dependent upon findings of the trial judge, as to facts developed to prove or disprove an oral agreement.

The appellant sets out at length the duty of joint venturers to observe the utmost good faith in the fiduciary relationship between them. *Wyoming-Indiana Oil and Gas Co. v. Weston*, 1932, 43 Wyo. 526, 7 P.2d 206, 80 A.L.R. 1037; *Fried v. Guiberson*, 1923, 30 Wyo. 150, 217 P. 1087. The defendant does not dispute the requirements of that relationship of trust and confidence and square-dealing, nor do we.

 There is no question but that until a joint venture is terminated, a joint venturer cannot exclude his co-adventurer from an interest in property by acquiring it on his own account while the venture is ongoing; and if he does, he must account. *Martin v. Hunter*, 1956, 179 Kan. 578, 297 P.2d 153. See also *McCartney v. McKendrick*, 1956, 226 Miss. 562, 85 So.2d 164;

*Kincaid v. Miller*, 1954, 129 Colo. 552, 272 P.2d 276; *Kaye v. Smitherman*, 10th Cir. 1955, 225 F.2d 583. Nor is there any disagreement that joint adventures, commonly referred to as joint ventures, are governed by the law of partnership. *True v. Hi-Plains Elevator Machinery, Inc.*, Wyo.1978, 577 P.2d 991, 996. The principal distinction between a joint venture and a partnership is that a joint venture usually relates to a single transaction. *P and M Cattle Co. v. Holler*, Wyo.1977, 559 P.2d 1019, 1021.

We do not consider it of great importance whether the parties to this appeal were engaged in a single joint venture or a series of joint ventures, each on the heels of the other. In any event, the purpose of the combination was to buy and sell leases. It appears to have been carried on in three phases, as found by the trial court. The findings of facts and conclusions of law in that regard are fully supported by the testimony and exhibits. The urgent questions revolve around the termination of their joint venture (or joint ventures).

There is no question but that the defendant acquired the leases in question *after* he and the plaintiff parted following an erosion of their combination, on account of plaintiff's dissatisfaction with the defendant's secretary and defendant's complaints over Madrid's handling of the money. We have carefully examined the versions of both parties and set out in detail their conflicting testimony.

The plaintiff relies on his own statement:
" 'If we go on ahead, let's finish up what we are working on, what we've developed, but from this day forward anything new that is developed by either you or me can strickly be the sole property of that individual.'

\*　　\*　　\*　　\*　　\*　　\*

"From that day forward as to anything new that I could develop on my own and anything new that he could develop on his own, that we would go our separate ways."

---

**3.** The 40% share of the 14% landowner's royalty nets Father McGovern about $4,000 per month. His share of the bonus paid by defendant came to about $8,000.00. That means an equal amount would have been paid to Margaret Sullivan, with Father Woods receiving 20% or half the amount of the other two owners.

On the other hand, the defendant's version was that:

"We terminated any relationship we had in there in buying * * * but at any rate, whichever date it was we terminated any relationship we had on anything that we didn't feel was eminently [sic] forthcoming."

\* \* \* \* \* \*

"A. He says, well, Ed, [Norton-Defendant] we are working on some things and let's talk about those and see what we have got going, because, he says, I intend to lease in the same area in which we have been involved in before. And I said, fine, I will do the same, and he said, what have you got going in here—I can't recall the exact words, but the intent both with him and with me, since we were talking about leasing immediately in the same area from that date forward, was, you know, what things do we have that we are working on that look emminent [sic] to us that we are involved in.

"Q. And what leases did you talk about?

"A. I told him that I had been working on the Boner lease, and I had been working on the Waring lease, and I am not sure whether he brought up the Reeder lease or whether I did. Frankly, I'm not sure on that, and Mr. Madrid has testified that he wasn't either.

"Q. Are those the only three leases he discussed?

"A. Yes, sir.

"Q. All right, you didn't discuss any others?

"A. No, sir." (Bracketed material added.)

▮ A joint venture sounds in, and is founded upon, contract. *Eblen v. Eblen*, supra; *West v. Soto*, 1959, 85 Ariz. 255, 336 P.2d 153; *Campagna v. Market Street Ry. Co.*, 1944, 24 Cal.2d 304, 149 P.2d 281; *Transit Equipment Co. v. Dyonisio*, 1964, 154 Colo. 379, 391 P.2d 478; *Taquena v. Bob Vale Painting Co.*, Okl.1973, 507 P.2d 539; *Joseph v. Donover Co.*, 9th Cir. 1958, 261 F.2d 812; West's Digest System, Joint Adventures, ▮ The burden of proof of a contract sued on rests on the plaintiff. *Black & Yates v. Negros-Philippine Lumber Co.*, 1924, 32 Wyo. 248, 231 P. 398, 37 A.L.R. 1487. The same burden rests on the plaintiff to prove its terms. 17A C.J.S. Contracts § 579b. A joint-venture agreement may be inferred from conduct, surrounding circumstances and transactions between the parties. *True v. Hi-Plains Elevator Machinery, Inc.*, supra. The "termination" agreement became a part of the total joint venture agreement of the parties, which if in written form, would be the dissolution clause. The law pertaining to joint adventures then applied to not only its provisions while ongoing, but also to that part of the agreement dealing with its dissolution.

▮ The burden of proof as to a particular fact in a suit between joint adventurers, rests on the party who affirmatively alleges or claims the existence of that fact. 48 C.J.S. Joint Adventures § 12h. It is always a question of fact to be determined from the evidence, whether a joint venture exists. *Producers Finance Corp. v. Lee*, 1942, 191 Okl. 326, 129 P.2d 850.

▮ The burden of proving a joint venture is on the party asserting its existence, *Fulenwider v. Writer Corp.*, Colo.App.1975, 544 P.2d 408; *First National Bank of Twin Bridges v. Sant*, 1973, 161 Mont. 376, 506 P.2d 835; *Dean Vincent, Inc. v. Russell's Realty, Inc.*, 1974, 268 Or. 456, 521 P.2d 334, 71 A.L.R.3d 576; West's Digest System, Joint Adventures, ▮ Whether a relationship of joint venturers exists between parties is primarily a question of fact for the trial court to determine from the facts and the inferences to be drawn therefrom. *Stearns v. Williams*, 1952, 72 Idaho 276, 240 P.2d 833. In an oil lease joint venture accounting case, even if it is conceded that the theory of one of the parties is plausible, when the trial court finds against that party, it is a rule of law that if the case is tried before the court without a jury, and if different conclusions can be rationally drawn from the evidence, then the case is one for the trial court's determination. *Stearns v. Williams*, supra. Counsel for the

losing party is prone to overlook that the trial judge, who has an advantage over us, may properly take an altogether different view of the testimony than does counsel. *Eblen v. Eblen*, supra.

 This is simply a case where the trial judge was more satisfied with the evidence of the defendant than that of the plaintiff, both as to the contract terms and its termination. We find nothing to reflect that the findings of the trial court were inconsistent with the evidence, contrary to the great weight of the evidence, or clearly erroneous. The evidence is clear that at the date of termination only three leases were discussed—Reeder, Boner and Waring—as unfinished business of the joint venture. No others were thereafter discussed, although they did subsequently get together to settle up their accounts. The plaintiff made no demand on the defendant with respect to any other lease until he filed the action here on appeal.[4] It was not until the Macken Estate lease, devised by the Macken Will to Mrs. Sullivan and the two Catholic priests, became productive[5] that plaintiff concluded he ought to have an interest in it. Justice Potter had some observations about those who come in after oil is discovered. Courts look with disfavor upon the claims of those who lie idle awaiting the results of development. The waiting may be years, months, or days, depending on the circumstances. There is an inherent injustice in one purportedly holding a right to assert an ownership in property to voluntarily await the propitious event and then decide, when the danger which has been at the risk of another is over, to come in and claim a share of the profits. *Merrill v. Rocky Mountain Cattle Co.*, 1919, 26 Wyo. 219, 181 P. 964.

There was nothing imminent about the Sullivan lease when plaintiff and defendant decided to go their separate ways. The last contacts had been made in October and early November, 1974. For a period in November and December, the defendant was not even in the area, having gone to Denver to tend to his own land office which was established the July previous and done some vacation traveling. The Sullivans had told defendant they would not even talk about a lease until the Macken Estate was closed. He did not know that the Macken Estate was closed and that the lands, which were covered by a lease to Woods Petroleum Company, had been set over to Mrs. Sullivan and the other devisees until on his way back to Denver from the mid-January termination meeting with plaintiff. Even then he could not deal with the Sullivans because of the outstanding lease to Woods Petroleum. According to the deposition of Mrs. Sullivan, when defendant began to seriously negotiate with Joe and Margaret Sullivan on or about January 29, 1975, they would not go ahead until Wood Petroleum finally refused to meet the defendant's price of $55.00 per net acre plus a 14% landowner's royalty rather than the usual 12½%.

There were other features of the Sullivan lease which could label it a new transaction. When defendant's initial offer of $25.00 an acre was made in October, 1974, he was only interested in one section of land. To an oilman, there were unattractive features about the other two sections of land in that they were offset by a dry hole and there was a dry hole on the land itself. He

---

4. The complaint in this case was filed on March 4, 1976. On March 1, 1976, plaintiff wrote the defendant a letter offering him a 50% participation in the Reeder lease and then stated:

 " * * * I would appreciate your reviewing your files to determine if the same possibility exists relative to any leases which you might have acquired and that a reciprocal arrangement would be in order by virtue of the original agreement which existed between us. If this situation did occur, then we should get together for a determination and distribution of net proceeds and interests to each of us.

 "In any event, please be advised that this offer will extend until March 15, 1976. Would you please acknowledge your acceptance or rejection of this proposal by acceptance or rejection of this proposal by signing and returning one copy of this letter."
 Defendant did not reply.

5. The well on the Sullivan lease was completed on September 30, 1975. Plaintiff learned of its completion in November, 1975, through the November 6, 1975 issue of *Petroleum Information*, a publication of a firm that reports such matters.

finally was required to take all three sections.

The principal dispute involves the Sullivan lease.[6] The other leases in which plaintiff claims an interest appear to have no particular value. The impression is left that they are included only for effect to add an appearance of substance to plaintiff's claim, although the leases could at some time become marketable.

There can be no recovery by a joint venturer for property acquired by the other after the joint venture has been completely terminated. In that event, the fiduciary relationship no longer exists and an acquisition after the termination is outside the scope of the joint venture. *Foley v. Phillips*, 1973, 211 Kan. 735, 508 P.2d 975. The burden was on the plaintiff to show that he had a joint venture relationship which entitled him to the fruits of a fiduciary relationship on the theory of joint venture. *Opco, Inc. v. Scott*, 10th Cir. 1963, 321 F.2d 471. Plaintiff has failed to successfully carry his burden of proof because the leases in question were, as found by the trial judge, outside the joint venture agreement.

With respect to defendant's cross-appeal, we conclude that the trial judge considered the defendant's claim of $4,033.50 credit to be a disputed item. Though perhaps weakly arguable from the record that plaintiff previously received credit for that amount in the November, 1975 settlement of accounts between the parties, the records referred to by defendant are not as clear in that regard as claimed. The $4,033.50 does show on Exhibit A, prepared by defendant, as a credit to plaintiff deducted from defendant's expenses. However, we can see it nowhere reflected on Exhibit B, which finally formed the basis for settlement of accounts in November, 1975. To us, Exhibit A reflects an admission by the defendant that plaintiff is entitled to $4,033.50; and Exhibit B tends to show that plaintiff did

not receive that amount in the settlement. We, therefore, conclude that there is no merit to defendant's claim of a credit of $4,033.50.

On the other hand, the trial judge apparently overlooked plaintiff's admission in the pleadings and testimony that defendant is entitled to a credit of $721.20.

Affirmed except remanded to the district court with directions to amend the judgment in favor of plaintiff by reduction in the amount thereof by the sum of $721.20.

ROSE, Justice, dissenting in part and concurring in part, with whom McCLINTOCK, Justice, joins.

I will dissent on the ground that Norton did not satisfactorily carry his burden of proving the oral liquidation agreement—as it was his obligation to do.

Partnership law is generally applicable to joint ventures. *P & M Cattle Co. v. Holler*, Wyo., 559 P.2d 1019.

The definition of the terms with which we are concerned are properly stated as follows:

" . . . 'Dissolution' designates that point in time when the partners cease to carry on the business together, 'termination' is the point in time when all the partnership affairs are wound up; and 'winding up' (often called 'liquidation') is the process of settling partnership affairs after dissolution." 60 Am.Jur.2d, Partnership, § 171, at p. 91.

It is said in Crane & Bromberg, Law of Partnership, HB, § 86, p. 489:

"After dissolution, a partnership continues until liquidated. Unless there is a right to continue the business, the remaining partners have the right and duty to wind up and liquidate the firm. Fiduciary duties persist during this period."

In this case, by oral agreement of mid-January, 1975, the partnership was dis-

6. Defendant paid Sullivan, McGovern and Woods a bonus of $55.00 per acre and resold at a bonus of $75.00 per acre for 400 net acres and retained an overriding royalty of 5% when he assigned the lease to Woods Petroleum Corporation on March 3, 1975. The royalty payments have been held up because of lis pendens notice filed by plaintiff but he has a division order.

solved but it was not then liquidated. It is the winding up or liquidation of the partnership with which we are here concerned, and the "winding up" was to be effected according to the intent of the parties as gleaned from their expressions, actions and by operation of law.

The nature of the burden of proof required to effect an oral winding up of a joint adventure is scantily dealt with in the law. Certainly, the burden is with him who asserts the terms and conditions by which the adventure will be liquidated. It is said in *Hurst v. Papierz*, 129 Ill.App.2d 277, 262 N.E.2d 773, 778 (1970):

> "Ordinarily, in an action between joint adventurers, the burden of proof as to a certain fact rests on the party who affirmatively alleges or claims that it exists, this being true in respect to such matters as the existence of a joint adventure, the termination of the venture, . . . ."

The question, however, becomes more acute when we are assigned the task of inquiring into the factual circumstances which must be present before courts will be able to say that the burden of proof has been discharged. Is it sufficient that the party asserting the terms of the liquidation agreement be charged with satisfying the ordinary burden of proof which, even though the weight of the evidence is almost balanced, would permit a fact-finder to reach the conclusion that termination has been effected? Or is the burden heavier than that?

One court has commented upon the subject of abandoning a joint adventure:

> "Abandonment [of a joint venture] is a voluntary thing, and there must be a clear, unequivocal and decisive act of the party to constitute abandonment in respect of a right secured. (Citations). . . . " *McIver v. Norman*, 187 Or. 516, 213 P.2d 144, 150 (1949). [Bracketed and parenthetical matter supplied]

Another court has said:

> " . . . In our opinion, there is no 'clear, unequivocal and decisive evidence' contained in this record, such as is re-

quired to establish the affirmative defense of an abandonment of a joint adventure. . . . " *McCartney v. McKendrick*, 116 Miss. 562, 85 So.2d 164, 169 (1956).

These cases state the correct standard of proof necessary to establish termination of a joint adventure. A fiduciary relationship exists among joint adventurers until the moment of liquidation. In the interests of promoting honest dealings among partners and creating the sort of trust which is necessary for economic progress in a complex society, the law imposes a number of duties and rules governing the conduct of fiduciaries. These not only proscribe activity *malum in se*, but they also proscribe activity conducive to wrongful activity or to the appearance of wrongful activity. For example, a trustee is not only enjoined from stealing the money of the trust's beneficiary, but he is also enjoined from placing the beneficiary's money with his own in a common bank account, even if he intends to keep scrupulous account of how much belongs to each.

Similarly, it is necessary, in order to avoid fraud or the appearance of fraud among partners, that a burden of clear, unequivocal and decisive proof be imposed on a joint adventurer who claims an agreement entitling him to exclusive exploitation of a business opportunity which he has come by as a fruit of the joint venture.

Norton testified that in mid-January he met with Madrid to discuss friction that had developed between the two of them and that Madrid offered to "terminate any arrangement we have right now," whereupon Norton agreed. Except for three particular leases which they each identified, it is clear that this is the point in time when dissolution of their association took place. This conversation reveals that each joint adventurer contemplated pursuing new leases for his own account in the Converse County, Wyoming, area, without including the other in such future endeavors. During this conversation the partners agreed to continue their joint venture with respect to three named leases, and the Sullivan lease was

not one of the three mentioned. With respect to the remaining business of the partnership, the liquidation agreement gets pretty fuzzy, the terms of which are far from being "clear, unequivocal and decisive." *McIver v. Norman*, supra; and *McCartney v. McKendrick*, supra.

Norton says that the intention was to terminate the partnership with respect to everything that wasn't *imminent*. In this regard, Norton's part of the dialogue at the trial went like this:

"A He [Madrid] says, well, Ed, we are working on some things and let's talk about those and see what we have got going, because, he says, I intend to lease in the same area in which we have been involved in before. And I said, fine, I will do the same, and he said, *what have you got going in here*—I can't recall the exact words, but the intent both with him and with me, since we were talking about leasing immediately in the same area from that date forward, was, you know, *what things do we have that we are working on that look emminent [sic] to us that we are involved in*." [Emphasis and bracketed matter supplied]

Madrid interprets the conversation as follows:

"A 'Q: Okay, did you advise him that you intended to lease for your own account in the Powder River Basin after that?

"'A: From that day forward as to anything new that I could develop on my own and anything new that he could develop on his own, that we would go our separate ways.'" (Redirect examination by Mr. Brown—Madrid reading from Madrid deposition).

For me, it is significant that Norton admits that *Madrid sought* the information (which was logically within Norton's knowledge) with respect to what partnership business Norton had been developing in the area in question. The record shows that Norton responded that he had just two leases, which did not include the Sullivan lease. (Madrid had been working on the third lease specifically excluded from the termination agreement.) In the same breath, however, Norton concedes that Madrid was asking him for information concerning any lease possibilities with which the partnership was involved and which were then *imminent*. Norton also testified that he didn't think there was much left to be said after they discussed the three named leases. Arguably, this means that Norton didn't consider the Sullivan lease imminent and, therefore, did not disclose to Madrid any pertinent information with respect to it. Norton also answers "yes" to a question from Madrid's counsel to the effect that they agreed to go their separate ways relative to anything except the three named leases. But, of course, this answer has to be considered in the context that Norton had told Madrid that the three discussed leases, one of which Madrid was working on, were the only pieces of business that were imminent.

But the question is—were the two named leases the only pieces of *imminent* business which, during the partnership, Norton had been pursuing in the area? Norton says, yes they were, but he has to prove this (in my judgment) by "clear, unequivocal and decisive" evidence because this fact is essential to his contention that the parties' minds had met concerning the terms of the liquidation arrangements. *McCartney v. McKendrick*, supra; and *McIver v. Norman*, supra.

The majority opinion sets out a number of reasons for the conclusion that the Sullivan lease was not *imminent* in mid-January, even though it was signed January 29 and negotiations for the lease had begun the previous October. Against a backdrop which requires clear, unequivocal and decisive evidence that the oral agreement of mid-January was intended to exclude the Sullivan lease from those which could fairly be considered imminent, I do not find support for the majority's statement that

"[t]here was nothing imminent about the Sullivan lease, when plaintiff and defendant decided to go each his own way. The last contacts had been made in October, 1974 and early November. . . ."

On October 1, 1974, when the joint adventure was in effect, Norton was examining records in the Converse County Courthouse concerning lands in the area agreed upon by Madrid and Norton. Norton located a half section of land in this area which was leased to Woods Petroleum Company, and he made notations on a lease card reflecting that the mineral-interest-owner was Cecelia Macken, a widow, who owned 100% of the minerals. The expiration date of the Woods Petroleum Company lease was January 29, 1975.

On October 14, 1974, Norton wrote to Joseph Sullivan in Douglas, Wyoming, stating that he was attempting to contact a Mrs. Cecelia Macken, a widow, with reference to a possible oil and gas lease on her lands in Converse County. Norton requested advice as to her current address. On October 15, 1974, Mr. Sullivan replied to Norton informing him that Mrs. Macken had passed away on July 6, 1974, and that Mr. Sullivan's wife, Margaret E. Sullivan, was the Executrix of the will and one of the devisees under the will. The other devisees of the mineral interest were Father Colm Woods and Father Terence McGovern. On October 18, 1974, Norton wrote Mr. Sullivan stating that he was interested in leasing the acreage for oil and gas and was willing to pay $25 per net acre for a five-year lease. Norton wrote that he was in Douglas quite often and suggested that they discuss the matter further at the Sullivans' convenience.

Norton noted on his lease card that on November 8, 1974, he transmitted a lease offering $25 per net acre. The Sullivans did not accept those terms. But if the terms were advantageous to them, they indicated they would be interested in leasing to Norton.

While Norton was negotiating with the Sullivans, there was competition from Woods Petroleum Company, who was the holder of the underlying lease. Woods Petroleum Company had made a higher offer than Norton's offer.

Norton concedes that he may have visited the Sullivans every time he was in Douglas because he was interested in obtaining the lease. Norton pursued his negotiations from the first time in October when he got in touch with Joe Sullivan and eventually obtained the lease.

In her deposition, Mrs. Sullivan offers this explanation of the fact that there is no record of written correspondence between her husband and Norton during the period from October 18, 1974 through January 29, 1975:

"So, since there was no further correspondence, apparently, on this would probably mean during that time he [Norton] was staying in Douglas quite a lot. I know his wife was there with him he told me, part of the time."

The following Norton testimony bears on this matter:

"Q. You had kept in touch with Mrs. Sullivan through the period from late October until the time that the lease was executed, had you not?

"A. I saw them several times during that period, yes, sir.

"Q. Is it a fact that you stopped and called on them every time you were in Douglas?

"A. I couldn't swear to that, but it's quite possible that I did, yes, sir."

Perhaps it can be said that in mid-January the obtaining of the Sullivan lease was not certain, but it cannot be disputed that, in mid-January, the negotiations which would win or loose the Sullivan lease were very imminent.

The record is clear that the parties, in their mid-January meeting, contemplated further meetings to wind up the affairs of the partnership business and a subsequent meeting was, in fact, held, but other partnership leasing in the Converse County area was not discussed.

In coming to this dissent, I am perfectly comfortable with the application of all the appropriate rules of appellate practice having to do with the judge being the trier-of-fact and the evidence and its inferences being viewed in favor of the successful party. These guidelines do not change the substantive rules which say that the court must base its decision upon such substantial evidence as will sustain the judgment. The evidence of liquidation must be, under the

rules of proof cited from various courts above, "clear, unequivocal and decisive."

Norton conceded that he and Madrid were to continue as partners with respect to leases that were imminent. In light of all the facts referred to above, and taking into account the fact that this partnership continued until liquidation, during which time the fiduciary relationship between the partners continued—I fail to see how courts can conclude that the required standard of proof is met when he who must prove the conclusiveness of the liquidation agreement can represent the terms of the liquidation agreement to be no more "clear, unequivocal and decisive" than that the partners would liquidate as to everything except that which is imminent. For me, this does not meet the standard of proof.

I would have reversed the trial court insofar as it ordered and decreed that Madrid "take nothing by his Complaint herein filed, insofar as he claims an interest in the oil and gas leases described" in his complaint.

I agree with the majority opinion insofar as it directs amendment of the money judgment in favor of Madrid and against Norton.